Filed 12/5/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S066939 |
| v. | ) | |
| | ) | |
| MICHAEL ALLEN and | ) | |
| CLEAMON JOHNSON, | ) | |
| | ) | Los Angeles County |
| Defendants and Appellants. | ) | Super. Ct. No. BA105846 |
| _____ | ) | |

A jury convicted codefendants Michael Allen and Cleamon Johnson of the first degree murders of Peyton Beroit and Donald Loggins, with multiple-murder special-circumstance findings as to both. After Allen waived his right to a jury trial, the court found that he had previously been convicted of first degree murder.[1] The jury returned verdicts of death for both defendants.

During guilt phase deliberations, two jurors reported their concern that another juror had made up his mind before the case was submitted to the jury.

---

[1] Penal Code sections 187, subdivision (a), 190.2, subdivision (a)(2), (3). All further statutory references are to the Penal Code unless otherwise indicated.

The jury further found that a principal was armed with a firearm (§ 12022, subd. (a)), Allen had personally used an assault weapon (§ 12022.5, subds. (a), (b)), and Johnson furnished a firearm for the purpose of aiding and abetting a felony (§ 12022.4).

Allen's previous conviction for the first degree murder of Chester White was affirmed by the Court of Appeal. We denied review. (*People v. Allen* (Mar. 23, 1995, B082055) [nonpub. opn.], review den. May 31, 1995, S046203.)

After speaking with all panel members, the court discharged that juror for having prejudged the case, and for having relied on evidence not presented at trial. Based on this record, the court erred.

We reverse the guilt and penalty phase verdicts.

## I.    FACTS

Because we are reversing defendants' convictions for the court's error during deliberations, a lengthy recitation of the facts of the crime is unnecessary.

The evidence introduced at trial indicated that defendants were members of a Los Angeles street gang. On August 5, 1991, Johnson told Allen to shoot rival gang member Beroit. Witnesses testified Allen shot both Beroit and Loggins as they sat in a parked car.

One witness of note was Carl Connor. He claimed to have been near the scene at the time of the shootings and identified Allen as the shooter. Defendants impeached Connor's testimony by introducing evidence of his employment timecard that showed he was at work on the day of the crime. Connor explained that he and a coworker, "Jose," often clocked in for each other, so the records would indicate they were at work when in fact they were not.[2]

## II.    DISCHARGE OF A JUROR FOR ASSERTED MISCONDUCT DURING THE GUILT PHASE

### A.  Introduction

As discussed more fully below, after several days of guilt phase deliberations, Jurors No. 5 (the foreperson) and No. 4 reported to the court their belief that Juror No. 11 had prejudged the case while evidence was still being

---

[2]    Connor testified he was later fired for this practice, but his employer said he was fired for a different reason.

presented. A lengthy investigation ensued during which the court interviewed all 12 jurors. Concluding that Juror No. 11 had prejudged the case and was relying on evidence not presented at the trial, the court discharged him and seated an alternate juror. The reconstituted jury found defendants guilty and later returned death verdicts.

Defendants contend Juror No. 11 was not unable to perform his duty. Thus, the court exceeded its discretion under section 1089[3] when it removed him and seated an alternate. Because the record does not show to a demonstrable reality that Juror No. 11 was unable to discharge his duty, the court abused its discretion by removing him. This conclusion, based on state law, obviates the need to decide whether Juror No. 11's removal also violated defendants' constitutional rights. (See *People v. Wilson* (2008) 44 Cal.4th 758, 814 (*Wilson*).)

**B. Background**

Guilt phase deliberations began on August 20, 1997. Over the ensuing four court days, the jury asked questions and heard testimony reread. The jury sent the court a note inquiring whether there was a reward associated with the case. The court explained there was no evidence in the record suggesting the existence of a reward, and admonished the jury not to speculate about matters outside the record.

After the court adjourned at the end of the fourth day, the bailiff discovered the foreperson and Juror No. 4 alone in the jury room. They asked the bailiff if

---

[3]     Section 1089 provides, in pertinent part, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

they could see the judge without the lawyers present. Through the bailiff the court replied it would not meet with them, and the bailiff suggested that instead they write a note. The jurors told the bailiff they were afraid to write a note, and if their concern was not dealt with that day, they would not have the courage to deal with it later.

On the following morning, the court told counsel of the jurors' colloquy with the bailiff. With the agreement of all counsel, the court interviewed the foreperson.[4] The foreperson said that he and Juror No. 4 believed that Juror No. 11 had made up his mind before deliberations began. According to the foreperson, on the second day of deliberations Juror No. 11 said, "When the prosecution rested, she didn't have a case."[5] When asked whether he had made up his mind, Juror No. 11 hesitated slightly and said, "No. No. No. I haven't made up my mind." Juror No. 11 had voted "undecided" during a preliminary vote taken that morning. The foreperson said that when he and Juror No. 4 met separately from the other jurors on the previous afternoon, they did not discuss the law or the facts of the case.

The court then questioned Juror No. 4, who also believed that Juror No. 11 had made up his mind before deliberations began. Juror No. 4 reported that Juror No. 11 had said, on several occasions, that he "was waiting for the prosecuting attorney to — to bring her case forward, and it never happened." Juror No. 4 also

---

[4]    All colloquy between the court and jurors was recorded and took place in the presence of all counsel. All questioning was done by the court.

[5]    The prosecutor had concluded her case-in-chief two weeks earlier.

There were varying accounts of the exact phrasing used by Juror No. 11. For example, the foreperson at another point reported that Juror No. 11 had said, "[W]hen the prosecution rested, I knew she didn't have a case." For the purposes of our analysis, there is no meaningful difference in the various ways Juror No. 11's statement was reported to the court.

believed Juror No. 11 misconstrued the evidence to support his position. By way of example, Juror No. 11 referred to Connor's testimony that his friend, Jose, sometimes punched in for him at work. Juror No. 11 said, "That's a lie. I know Hispanics, they never cheat on timecards, so this witness [Connor] was at work, end of discussion."[6] Juror No. 4 also believed Juror No. 11 was not "being completely honest" when he denied having already made up his mind. Juror No. 4 said she and the foreperson had not discussed the law or the facts of the case while alone in the jury room.

Over defendants' objections, the court spoke individually to each of the other jurors. In response to the court's inquiry whether any juror "appeared to have gone into the deliberations with a very fixed immutable position, prior to actually discussing the case?" Juror No. 1 responded, "From my standpoint [three] jurors have had this mindset from the beginning. In other words, all the witnesses are unreliable, all the testimony is unreliable." According to Juror No. 1, it was another juror, not Juror No. 11, who had said the prosecutor failed to make her case. Juror No. 1 recalled the remark about the timecard, but not who had made it. Juror No. 11 had nodded off during deliberations, and did not pay attention if someone said something he did not like.

Juror No. 2 said some jurors indicated they had been convinced how to vote before deliberations began. He did not specify Juror No. 11, and noted that no one had said they "didn't need to come in [the jury room] to do anything."

Juror No. 3 believed no juror began deliberations with a fixed view. Juror No. 3 observed that, at one point, Juror No. 11 leaned back with his eyes closed, but she thought he was listening.

---

**6** Juror No. 11 was not Hispanic.

Juror No. 6 suspected Juror No. 11 and another juror began deliberations with their minds already made up, but acknowledged each juror said he or she was still undecided at the start of deliberations.  With respect to the timecard, Juror No. 6 stated Juror No. 11 had said, "I don't think a Hispanic person would do that kind of thing."  Juror No. 6 said Juror No. 11 seemed groggy at times.

Juror No. 7 said Juror No. 11 had said, "I had my mind made up before I already came in here."  Juror No. 7 also said another juror had similar thoughts.

Juror No. 8 said two jurors, other than Juror No. 11, had said they had entered deliberations with "certain things already happening in their head."  Juror No. 8 said Juror No. 11 had made the timecard remark, and once sat with his eyes closed, although he was not necessarily asleep.

Juror No. 9 said Juror No. 11 seemed less open-minded than the other jurors, but acknowledged he was engaging in the deliberative process.  Juror No. 9 also said Juror No. 11 made the timecard remark, and fell asleep a few times.

Juror No. 10 reported Juror No. 11 said he had entered deliberations already having decided the case, but then "recanted."  Juror No. 10 stated Juror No. 11 said that nobody would falsify a timecard; she did not hear him specify Hispanics. Juror No. 10 said Juror No. 11 had once fallen asleep.

 Juror No. 12 admitted *he* had said during deliberations that he was "pretty sure" what his decision would be before deliberations had started.  Juror No. 12 recalled the timecard remark, but could not remember who made it.  Juror No. 12 said Juror No. 11 had dozed off once during deliberations.

Juror No. 11 denied having made up his mind before deliberations.  When the foreperson asked if he had done so, Juror No. 11 said he had not.  Juror No. 11 did admit that more than once during deliberations he said, "When the prosecution rested, that they had not convinced me."  Juror No. 11 acknowledged he made the remark about Hispanics not falsifying timecards, and that he based his opinion on

6

"job experience." Juror No. 11 denied ever falling asleep during deliberations, but allowed that someone might have thought he had.

Over defendants' objection, the court granted the prosecutor's motion to discharge Juror No. 11, finding he had made up his mind before jury deliberations began and was basing a decision about Connor's credibility not on the evidence presented, but rather on his personal opinion of how Hispanics as a group behave. The court stated, "[I]t would appear to me that the consensus is, having now questioned 12 jurors, including No. 11, that the juror made it relatively clear to a majority of the jurors here that he had decided the case; that he had his mind made up at the time — at a time before the matter had been submitted to the jury."

The court further stated:

"My finding of fact is that the [timecard] statement was made and that the juror is using facts not in the record to decide this case. He is using evidence outside of the record. That is inappropriate.

"I also find that he made the statements attributed to him, to wit, that his mind was made up prior to the case being submitted.

"And I further find that he apparently reiterated that feeling today.

"So it is not a problem in that people say a lot of things and they toss things around in deliberations.

 [¶] . . . [¶]

"If you turn over enough rocks, all kinds of things are apt to rear up.

"And I am not trying to be super technical or picky with this, but it is a situation that with all things considered, the opinions of a large number of jurors, including the foreperson who worried about this and gave it a great deal of thought, and I gave his impression a great deal of weight in not being an unintelligent or dishonest fellow, and given the court's own assessment of the credibility of the various jurors, some of whom are quite straightforward, others

7

who downcast their eyes in an obvious fashion when asked certain questions and only gave up certain information, including No. 11, I find that he made the statements attributed to him in having made up his mind and that he has done so and that he further attempted to decide a rather important issue from things outside the record which is . . . inappropriate."

The court replaced Juror No. 11 with an alternate. It denied defendants' motion to discharge the foreperson and Juror No. 4.**7** The court directed the jury to begin its deliberations anew.

At the end of the next day, the jury reported by note that it could not reach a unanimous verdict regarding Allen. On the day after that, the note was read in open court and the foreperson indicated the newly constituted jury had taken only one formal ballot, with the vote split 10 to two. The court ordered the jury to resume deliberations. Beginning that afternoon and continuing through the morning of the next court day the jury heard readback of additional testimony. Shortly after the readback concluded, the jury returned its guilt phase verdicts as to both defendants.

### C. Discussion

Defendants contend the court abused its discretion by interviewing all 12 of the jurors, interviewing them in a harsh and intrusive manner, and discharging Juror No. 11.

The court may discharge a juror for good cause (see § 1089), which includes a failure to follow the court's instructions. (E.g., *People v. Alexander* (2010)

---

**7** The court found the foreperson and Juror No. 4 had themselves committed misconduct by meeting separately, but did not discharge them. The Attorney General concedes, and we agree, the separate meeting was misconduct.

The court took no action on reports by several jurors that other panel members, in addition to or different from Juror No. 11, had prejudged the case.

8

49 Cal.4th 846, 926 (*Alexander*).) The court here repeatedly told the jurors to not form any opinions about the case until it was submitted to them for deliberations. (§ 1122, subd. (b).) It also instructed: "You must not . . . consider or discuss facts as to which there is no evidence." (CALJIC No. 1.03; see, e.g, *Wilson*, *supra*, 44 Cal.4th at pp. 829-830; see also CALCRIM No. 200.)

### 1. *Investigation of Asserted Juror Misconduct*

Whether and how to investigate an allegation of juror misconduct falls within the court's discretion. (*Alexander*, *supra*, 49 Cal.4th at p. 927.) Although a court should exercise caution to avoid threatening the sanctity of jury deliberations, it must hold a hearing when it learns of allegations which, if true, would constitute good cause for a juror's discharge. (*People v. Lomax* (2010) 49 Cal.4th 530, 588 (*Lomax*).) Failure to do so may be an abuse of discretion. (*Ibid.*)

Defendants first contend the court erred by interviewing all of the jurors because the foreperson's report did not suggest any juror was engaging in misconduct. Because Juror No. 11 was participating in deliberations, defendants argue, no further inquiry was needed. That argument fails.

Defendants rely on *People v. Cleveland* (2001) 25 Cal.4th 466 (*Cleveland*), in which the trial court abused its discretion by excusing a juror for a purported refusal to deliberate. There was no refusal to deliberate here. Instead, some jurors alleged Juror No. 11 had *already decided* on his verdict before deliberations began, and was defending this preconception during deliberations.

The court was told that Juror No. 11 had said during deliberations: "When the prosecution rested, she didn't have a case." Such a statement might suggest that the juror had made up his mind before all evidence was presented and the court had instructed on the law. For a juror to decide a case before it is submitted is misconduct. Accordingly, the court's further inquiry was reasonable. (See

9

*People v. Barnwell* (2007) 41 Cal.4th 1038, 1054 (*Barnwell*) [juror note about possible juror misconduct due to bias against police officer testimony required the court to conduct a hearing].) The foreperson indicated Juror No. 4 shared his concerns, and her views may have shed a different light on the statements at issue. The court did not abuse its discretion by interviewing Juror No. 4 or the remaining jurors to ascertain whether they could provide additional information about the assertion. (See *id.* at pp. 1048-1051 [trial court took testimony from all 12 jurors during inquiry into possible juror misconduct].)

Defendants next contend the court's questioning was not restrained and neutral but aggressive and leading. As a result, the court may have coerced jurors into stating Juror No. 11 had committed misconduct. This record reveals no abuse of discretion in the manner of inquiry. While, of course, the court's tone of voice is not revealed, the content of its questions appears measured. Neither defendant objected to the court's tone of voice or attempted to make a further record on this point.

Defendants also focus on the court's questioning of Juror No. 4 when the court asked why she believed Juror No. 11 had prejudged the case. She responded, "Because whatever piece of evidence we addressed he would make very strong pronouncements about how he felt about it, and always these pronouncements were to support his — his opinion, and they often really had no logic to them at all." The court responded by saying it did not "want to know specifically all the reasoning, and so forth, that's going on in the jury room at all; I'm really not interested in that. But maybe if you could give me an example of what you are talking about, or maybe you could say it in a different way for me." Juror No. 4 then mentioned the timecard remark. Her response indicated the *possibility* of a separate instance of misconduct: relying on facts outside the record. The court properly inquired further because it had previously admonished

the jury to not speculate or consider matters beyond the record.[8]  The court's questions to the remaining jurors were within the legitimate exercise of its discretion.

### 2. Discharge of Juror No. 11

Great caution is required in deciding to excuse a sitting juror.  A court's intervention may upset the delicate balance of deliberations.  The requirement of a unanimous criminal verdict is an important safeguard, long recognized in American jurisprudence.  This safeguard rests on the premise that each individual juror must exercise his or her own judgment in evaluating the case.  The fact that other jurors may disagree with a panel member's conclusions, or find disagreement frustrating, does not necessarily establish misconduct.

Because of the importance of juror independence, review of the decision to discharge a juror involves " 'a somewhat stronger showing' than is typical for abuse of discretion review . . . ." (*Lomax*, *supra*, 49 Cal.4th at p. 589.)  The basis for a juror's discharge must appear on the record as a " 'demonstrable reality' " and "involves 'a more comprehensive and less deferential review' than simply determining whether any substantial evidence" supports the court's decision. (*Ibid*.)  The reviewing court does not reweigh the evidence but looks to see whether the court's " 'conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.]" (*Id.* at pp. 589-590.)  This heightened standard is used by reviewing courts to protect a defendant's fundamental rights to due process and a fair trial, based on the individual votes of an unbiased jury (see *Barnwell*, *supra*, 41 Cal.4th at p. 1052), which are also hallmarks in American jurisprudence.

---

[8]    As noted, the jury asked whether there was a reward associated with this case.

11

The court discharged Juror No. 11 on two distinct bases: his alleged prejudgment of the case and reliance on facts outside the record.**9** This record does not manifestly support either basis.

### a. Prejudgment

Although the record amply demonstrates that during deliberations Juror No. 11 did say words to the effect that, "When the prosecution rested, she didn't have a case," the precise meaning of his statement is not entirely clear. The court interpreted it to mean that Juror No. 11 had, in effect, prejudged the case by deciding to vote not guilty before hearing defense and rebuttal evidence, closing argument, jury instructions, and the views of his fellow jurors.

In *Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778 (*Grobeson*), the Court of Appeal affirmed the trial court's grant of a motion for a new trial based on juror misconduct. There was evidence that, in the middle of the trial, one juror told another, " ' "I made up my mind already. I'm not going to listen to the rest of the stupid argument." ' " (*Id.* at p. 784.) In a posttrial declaration the juror denied making the statement, and instead claimed she had made up her mind only during deliberations. (*Ibid.*) In evaluating the juror's credibility, the trial court concluded that during trial the juror did make the statement that she had made up her mind and would not continue to listen.**10** The Court of Appeal concluded the

---

**9** As noted, several jurors observed Juror No. 11 slept during deliberations. (See, e.g., *People v. Ramirez* (2006) 39 Cal.4th 398, 456-458 [significant sleeping by a juror during deliberations may amount to misconduct warranting discharge].) When the court discharged Juror No. 11, however, it made only passing reference to these reports. The record does not show that the court actually relied on this ground when it discharged Juror No. 11. Accordingly, we do not consider it. (See *Lomax*, *supra*, 49 Cal.4th at p. 590.)

**10** In granting the motion for a new trial, the trial court excluded the juror's subsequent declaration as inadmissible evidence of her mental process. Subdivision (a) of Evidence Code section 1150 provides: "Upon an inquiry as to

*(Footnote continued on next page.)*

12

juror's prejudgment was serious misconduct. Her midtrial remark required "neither interpretation nor the drawing of inferences. It [was] a flat, unadorned statement that this juror prejudged the case long before deliberations began and while a great deal more evidence had yet to be admitted." (*Grobeson*, *supra*, 190 Cal.App.4th at p. 794.)

*Grobeson* involved misconduct committed while evidence was still being presented.[11] This case is different. Juror No. 11's statement was made during deliberations, and only made reference to his previous state of mind at a single point during the trial. It did not indicate an intention to ignore the rest of the

*(Footnote continued from previous page.)*

the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." The Court of Appeal ruled the trial court correctly excluded the juror's posttrial declaration, and admitted evidence of her midtrial remarks to her fellow jurors. (*Grobeson, supra,* 190 Cal.App.4th at pp. 785-786, 793-794.)

Evidence Code section 1150 applies only to postverdict challenges. (See *Cleveland*, *supra*, 25 Cal.4th at p. 485.) It does not apply to a court's middeliberation consideration of the jurors' various statements. In order to protect the sanctity of jury deliberations, however, a court's inquiry into possible grounds for misconduct should be as limited in scope as possible, and focus on the conduct of the jurors rather than the content of the deliberations. (*Ibid.*)

[11] Similarly, in *People v. Daniels* (1991) 52 Cal.3d 815, the trial court acted within its discretion by removing a juror who had discussed the case with outsiders and had expressed an opinion on the defendant's innocence before deliberations began. In upholding the trial court's decision, however, we declined to decide whether the juror's statements during the evidentiary portion of the trial manifested fixed opinions or were made only in response to evidence that he had heard. (*Id.* at pp. 863-864.)

proceedings. The Attorney General has cited no case, and we have found none, in which a juror was discharged for prejudgment based solely on comments made during deliberations.

Unlike the juror in *Grobeson*, Juror No. 11's comment, however phrased, was subject to some interpretation. His remark was not an "unadorned statement" that he had conclusively prejudged the case. It did not establish that he had ignored further evidence, argument, instructions, or the views of other jurors. Although section 1122 requires jurors not to form an opinion about the case until it has been submitted to them, "it would be entirely unrealistic to expect jurors not to think about the case during the trial . . . ." (*People v. Ledesma* (2006) 39 Cal.4th 641, 729 (*Ledesma*).) A juror who holds a preliminary view that a party's case is weak does not violate the court's instructions so long as his or her mind remains open to a fair consideration of the evidence, instructions, and shared opinions expressed during deliberations.

Juror No. 11's statement that the prosecutor had failed to prove her case was made at some point during deliberations, not during the presentation of evidence or even at the outset of the deliberations.[12] The record does not demonstrate that Juror No. 11 refused to listen to all of the evidence, began deliberations with a closed mind, or declined to deliberate. Indeed, other evidence indicates the contrary.

*Wilson*, *supra*, 44 Cal.4th at pages 836 to 841, is instructive. There, we vacated a penalty judgment for the improper discharge of a juror. The trial court

---

[12] As noted, the foreperson told the court Juror No. 11 had made his comment about the prosecutor's case on the second day of deliberations. The foreperson and Juror No. 4, however, did not attempt to bring their concerns to the court's attention until after the jury had been deliberating for four days, and before it had taken an initial vote.

14

gave several reasons for the action, including alleged prejudgment of the penalty phase. The trial court relied on two statements the juror made during the presentation of *guilt* phase evidence: " ' "How can you hold someone responsible for their actions?" ' " and " ' "This is what you expect when you have no authority figure, this type of behavior." ' " (*Id.* at p. 837.) In vacating the penalty judgment, we concluded this evidence did not establish a demonstrable reality that the juror prejudged the penalty question, given that he participated in the guilt phase deliberations, voted to convict, joined in an initial vote to impose the death penalty, and then changed his vote only after two other jurors did the same. (*Id.* at pp. 840-841.)

Here, although Juror No. 11 appeared to have held a strong opinion about the prosecutor's case, he was participating in jury discussions. He voted "undecided" on the fifth day of deliberations, just before the court interviewed the jurors. No juror testified Juror No. 11 expressed doubt as to the prosecutor's case during the presentation of evidence, and there was no indication that he stopped paying attention after the prosecutor rested. Juror No. 11's conduct during deliberations may have annoyed other jurors, but that is not dispositive evidence that he had prejudged the case.

This case is different from *Lomax*, where the juror refused to deliberate. Juror No. 11 was participating in the deliberative process: Other jurors confirmed that Juror No. 11 commented, sometimes assertively, on the views of other panel members and gave his opinion of what the evidence showed. Jurors are supposed to share their own evaluations of the credibility of witnesses and the strength of the evidence. That a given juror may reach a different conclusion on these questions from those espoused by other jurors, or may do so forcefully, is not necessarily evidence of prejudgment or a failure to deliberate.

15

Juror No. 11's "undecided" vote and participation in deliberations were consistent with his representation to both the foreperson and the court that he had not made up his mind before deliberations began. The court here, however, implicitly rejected his denials of prejudging the case. Yet, the court made no findings that his "undecided" vote and participation were somehow a sham or lacking in good faith. Moreover, the court did not ask Juror No. 11 what he meant by his statement. Nor did it attempt to resolve the matter with curative instructions.

The court's approach to resolving the issue was also deficient. Based on Juror No. 11's statement about the prosecutor's case, the court concluded that he "had his mind made up." In doing so, the court relied on "the opinions of a large number of jurors including the foreperson" who, the court noted, had given the question great thought. It is true that two jurors explicitly said that Juror No. 11 made the statement that the prosecutor had not made her case. Two others reported that he had said his mind was made up before deliberations began. However, the court's finding that Juror No. 11 "made it relatively clear to a majority of the jurors here that he . . . had his mind made up at the time . . . before the matter had been submitted to the jury" is inconsistent with this record.

The reality that a juror may hold an opinion at the outset of deliberations is, as we have noted (see *Ledesma*, *supra*, 39 Cal.4th at pp. 729-730), reflective of human nature. It is certainly not unheard of that a foreperson may actually take a vote as deliberations begin to acquire an early sense of how jurors are leaning. We cannot reasonably expect a juror to enter deliberations as a *tabula rasa*, only allowed to form ideas as conversations continue. What we can, and do, require is that each juror maintain an open mind, consider all the evidence, and subject any preliminary opinion to rational and collegial scrutiny before coming to a final determination.

16

We specifically note further that a trial court should be wary of relying on the *opinions* of jurors, rather than on its own consideration of objective facts. Under Evidence Code section 1150, for example, a court cannot consider evidence of a juror's subjective reasoning process in deciding whether to grant a new trial based on purported juror misconduct. (See, e.g., *People v. Steele* (2002) 27 Cal.4th 1230, 1261 (*Steele*).) Although this case is not governed by Evidence Code section 1150, its underlying policy provides guidance: In deciding whether to discharge a juror for misconduct, a court should focus on its own consideration of a juror's *conduct*. The court cannot substitute the opinions of jurors for its own findings of fact.

In making its findings, the court here appropriately relied on the jurors' recitation of what Juror No. 11 had said. And a reviewing court defers to the factual determinations the trial court makes when assessing the credibility of the jurors, who may offer conflicting accounts. (E.g., *Barnwell*, *supra*, 41 Cal.4th at p. 1053.) That Juror No. 11 made the comment was not disputed, nor was there a significant dispute about his attitude during deliberations. The jurors' opinions, however, about Juror No.'s 11 comment should not have played a role in the court's ruling. Great tension may arise when a group of people are asked to make an important decision and views vary. While some jurors may be understandably impatient that another will not adopt their view and abandon his or her own, the mere failure to change a vote is not necessarily misconduct.

Certainly, a court may not discharge a juror merely because he or she harbors doubts about the prosecution's case. (E.g., *Cleveland, supra*, 25 Cal.4th at p. 483.) That Juror No. 11 was unimpressed by the strength of the evidence and unpersuaded by his colleagues' assertions during deliberations does not amount to prejudgment. To conclude otherwise would threaten the ability of jurors to express minority viewpoints during deliberations and undermine the principle that

17

both parties are entitled to the independent judgment of each individual juror. (CALJIC No. 17.40; CALCRIM No. 3550.)

In light of his undecided vote and participation in the deliberative process, Juror No. 11's middeliberation statement about the prosecutor's case, even when coupled with his expression of strong views during deliberations, does not establish prejudgment to a demonstrable reality. The court abused its discretion is discharging him on that basis.

### b. Reliance on facts not in evidence

The court discharged Juror No. 11 on the additional ground that his remark about Connor's timecard constituted impermissible reliance on facts not in evidence.

The jurors were repeatedly instructed to consider only the evidence received at trial, and to decide the case solely on that evidence. Jurors may not present as facts specialized knowledge they claim to possess. However, a distinction must be drawn between the introduction of new facts and a juror's reliance on his or her life experience when *evaluating* evidence.

In *People v. Fauber* (1992) 2 Cal.4th 792, 839, we observed: "Jurors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room." In *In re Malone* (1996) 12 Cal.4th 935, 963, we explained the distinction between the introduction of new facts and reliance on experience to evaluate evidence as follows: "Jurors' views of the evidence . . . are necessarily informed by their life experiences, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct. [Citations.]"

18

We returned to the issue again in *Steele*. There, we held the trial court did not abuse its discretion in denying the defendant's motion for a new trial based on several jurors' assertions of expertise. (*Steele*, *supra*, 27 Cal.4th at pp. 1265-1268.) The jury in *Steele* received evidence about the defendant's military experience and training during the Vietnam War, as well as expert testimony about neurological testing performed on him. (*Id.* at pp. 1240-1241.) The defendant moved for a new trial, asserting four jurors with military experience told the other jurors it was unlikely the defendant was exposed to combat in Vietnam, and two other jurors explained, based on their experiences in the medical field, that the validity of one of the neurological tests was inadequately established. (*Id.* at pp. 1259-1260.) In rejecting the claim of juror misconduct, we noted, "All the jurors, including those with relevant personal backgrounds, were entitled to consider this evidence and express opinions regarding it. '[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors.' [Citations.] 'It is "virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." ' [Citations.] A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in *evaluating and interpreting* that evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's *analysis* of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations. 'Jurors are not automatons. They are imbued with human frailties as well as virtues.' [Citation.]" (*Id.* at p. 1266, italics added; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 162

19

[no misconduct when jurors referenced their own experiences with drugs in evaluating the defendant's drug use].) Our observation in *Steele* describes Juror No. 11. He plainly was not an automaton, and he relied on his life experience in evaluating Connor's credibility.

The record here does not demonstrate Juror No. 11 ignored or substituted his own beliefs for the court's legal instructions. In fact, the court informed the jury: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars." (CALJIC No. 2.21.2.) Connor claimed to be an eyewitness to the shootings, while other evidence indicated that he was not there. This conflict went to the heart of Connor's credibility. Juror No. 11's comments show that he did not believe Connor's testimony that someone punched in for him on the day of the shootings, and thus rejected his testimony.

Juror No. 11's remark did not constitute misconduct. His positive opinion about the reliability of Hispanics in the workplace did not involve specialized information from an outside source. It was an application of his life experience, in the specific context of timecards and the workplace, that led him to conclude Connor was not telling the truth about the shootings.[13] Juror No. 11 simply found

---

**13** Juror No. 11's comment did not involve the kind of racial bias that may reflect misconduct. (Cf., e.g., *Wilson*, *supra*, 44 Cal.4th at p. 831 ["A juror whose personal view was that African-American defendants *never* should, or *always* should, receive the death penalty commits clear misconduct, both by not considering the particular facts of the case and by making the penalty decision based on racial bias."]; accord, *United States v. Heller* (11th Cir. 1986) 785 F.2d 1524, 1527 ["A racially or religiously biased individual harbors certain negative stereotypes which, despite . . . protestations to the contrary, may well prevent him

*(Footnote continued on next page.)*

20

unconvincing Connor's excuse as to why his timecard indicated he was elsewhere. (See *Wilson*, *supra*, 44 Cal.4th at p. 831 [African-American juror's evaluation of mitigating evidence presented by an African-American defendant was no more the product of improper racial considerations than the non-African-American jurors' rejection of the same evidence].)

Although jurors are entrusted to evaluate the credibility of witnesses, they may not do so based on prejudice or stereotype. Nor may they apply differing standards to the consideration of different witnesses. Defendants' case is unlike *Barnwell*, *supra*, 41 Cal.4th at pages 1048 to 1054. There, we held the trial court did not abuse its discretion in discharging a juror who had exhibited a general bias against law enforcement officers and was judging the testimony of the police officers by a standard different from that which he applied to other witnesses. Juror No. 11 here expressed no general bias against any group of which the witness Connor might have been a member. Rather, he drew on his own personal life experience to conclude this witness lacked credibility because of the explanation he gave for a critical discrepancy.

It may be argued that Juror No. 11's conclusion was based upon a weak premise or rested upon an overbroad inference. Jurors, however, are the judges of credibility, and conscientious jurors may come to different conclusions. It is not the province of trial or reviewing courts to substitute their logic for that of jurors to whom credibility decisions are entrusted. "[T]hat a juror does not deliberate

---

*(Footnote continued from previous page.)*

or her from making decisions solely on the facts and law that our jury system requires."].)

21

well or relies upon faulty logic or analysis . . . is not a ground for discharge." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)

Juror No. 11's timecard remark did not introduce unproven facts into the case. The court abused its discretion in discharging him on that basis.

### III.   DISPOSITION

Because the court improperly discharged Juror No. 11 during guilt phase deliberations, both guilt and penalty phase judgments must be reversed. In view of this disposition, we need not address defendants' remaining claims.[14]

**CORRIGAN, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**

---

[14]   We note, however, we recently rejected a claim, which is substantially similar to one raised in this appeal, regarding the underrepresentation of women on the grand jury. (*People v. Garcia* (2011) 52 Cal.4th 706, 723-739.)

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Allen and Johnson
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S066939
**Date Filed:** December 5, 2011
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Charles E. Horan


_____

**Counsel:**

Brent F. Romney, under appointment by the Supreme Court, for Defendant and Appellant Michael Allen.

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Andrew S. Love, Assistant State Public Defender, for Defendant and Appellant Cleamon Johnson.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Brent F. Romney
101 S. Kraemer Blvd., Suite 240
Placentia, CA  92870
(714) 524-3314

Andrew S. Love
Assistant State Public Defender
221 Main Street, Tenth Floor
San Francisco, CA  94105
(415) 904-5600

Gary A. Lieberman
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-6863