Filed 6/30/22  P. v. Alvarado CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CARLOS ALVARADO,<br><br>        Defendant and Appellant. | A161578<br><br>(Lake County<br>Super. Ct. No. CR958401) |

A jury found defendant Carlos Alvarado guilty of inflicting corporal injury resulting in a traumatic condition on a person with whom he was in a dating relationship within seven years of prior domestic violence convictions. (Pen. Code, § 273.5, subd. (f)(1).)[1]  He was sentenced to five years in prison and ordered to pay, among other fines and fees, a criminal justice administrative fee under former section 29550, subdivision (c), of the Government Code.  On appeal, defendant contends (1) the trial court abused its discretion and violated his constitutional right to a jury trial by discharging one of the jurors for cause during guilt phase deliberations; and (2) the criminal justice administrative fee must be vacated.  We will modify the judgment to vacate the criminal justice administrative fee and affirm the judgment as modified.

---

[1]      Further unspecified section references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by information with one felony count of willfully inflicting corporal injury resulting in traumatic injury on H.T., a person with whom he had been in a dating relationship (§ 273.5, subd. (f)(1); count one). The charges stemmed from an incident in August 2020 in which defendant allegedly punched H.T. several times during an argument. The information further alleged that defendant committed the offense within seven years of two prior domestic violence convictions under sections 243, subdivision (e)(1), in 2015 and 2017, and a prior conviction under 273.5, subdivision (a), in 2016.

The trial court bifurcated adjudication of the prior conviction allegations, and the matter proceeded to a jury trial on count one. At trial, the jury heard testimony from two witnesses: H.T., and Lake County Sheriff's Deputy Brigham Reese, the officer who was dispatched to the scene of the incident. Before the jury began guilt phase deliberations, the trial court gave standard jury instructions, including instructions on the charged offense under section 273.5, subdivision (f)(1), and the lesser included offense of battery against a person with whom the defendant was in a dating relationship under section 243, subdivision (e)(1). The court further instructed in relevant part: "You must follow the law as I explain it to you, even if you disagree with it." "You must reach your verdict without any consideration of punishment."[2]

Approximately an hour and a half into deliberations, the trial court received a note from the jury foreperson (Juror No. 9) stating, "Can we have clarification on jury nullification and if we can consider it in this case?" The

---

[2]    These instructions echoed the trial court's admonitions to the potential jurors during voir dire, and to the jury shortly after it was empaneled.

court reconvened the matter and explained to the jurors that "jury nullification is where a jury ignores the law in the case or the instructions that I've given. You all took an oath to follow the instructions. I've given you those instructions. So you're required under the law to follow those instructions." The court then directed the jury to return to its deliberations.

Shortly thereafter, the trial court received another note from the foreperson stating, "One juror is raising the question that, in pursuit of fairness and justice, the jury is allowed to disregard the facts due to their opinion that the law and punishment would be unjust on the first count/charge resulting in disagreement." The court again reassembled the jurors in the courtroom and told them, "I'm going to respond by telling you two things. These two things are contained in the instructions that I read to you and that I provided to you. The first is you must follow the law as I explain it to you, even if you disagree with it. And second, you must reach your verdict without any consideration of punishment."

Less than half an hour later, the trial court received a third note from the foreperson stating, "We cannot reach an agreement on the greater crime charges, and we are requesting guidance as to how to move forward." The court again reconvened the proceedings and questioned Juror No. 9, who confirmed that the jury was "hopelessly deadlocked" on count one. Juror No. 9 explained that the disagreement stemmed from "the difference between" the felony charge and the lesser included misdemeanor. The court stated, "Okay. I have instructed you originally and then just a few minutes ago to reach your verdict without any consideration of punishment. [¶]. . .[¶] Did that clear up your duties?" Juror No. 9 responded, "Can I say for eleven of us, yes. There's—the reason we can't get to that decision is because of the punishment." The court asked, "Are you stating one juror is not willing to

3

follow the instructions that I've given?" Juror No. 9 responded, "Yes, sir," whereupon Juror No. 10 interjected, "That's not true."

The trial court removed the jury from the courtroom and brought each juror back separately for questioning. The court asked each juror if they could follow the court's instructions and reach a verdict without consideration of punishment, and each responded in the affirmative. The matter then went into recess until the following day.

The next morning, roughly 45 minutes after resuming deliberations, the foreperson sent the trial court a note stating, "We are 11-1 deadlocked on the first charge. One person in our jury has been disregarding instructions and ignoring laws, resulting in a deadlock. Said juror said, 'no jury has been punished for not following rules, so I am not changing my decision.' "[3]

The trial court again reconvened the proceedings and separately questioned each juror, asking if there was a person on the jury who was not following instructions. Juror No. 1 said yes, pointed to Juror No. 10's chair, and explained that "yesterday he said that he thinks that the gentleman that is on the defense is guilty, over 50 percent guilty, but he wasn't inclined to, how did he put it, he wasn't inclined to vote for guilty for the first count but he would be willing to vote for the second count. And then he started off with jury nullification, and that's where it went downhill from there."

Juror No. 2 told the trial court that Juror No. 10 was "[a]bsolutely" not following the court's instructions and was "basically saying that he has the right, irregardless of what you have said or the rules that have been stated, that he has the right to choose what he wants to do and not follow the guidelines and rules."

---

[3] The foreperson also requested a readback of the trial court's individual questions to the jurors, but the court denied the request.

4

Juror No. 3 and Juror No. 4 likewise told the court that Juror No. 10 was not following the court's instructions. As Juror No. 4 explained, "The first words out of the person's mouth upon deliberations were if convicted, this would cause the person to lose—the felony conviction would cause the person to lose their right to have a gun and lose their right to vote, something on that order." "He talked about jury nullification, that if the penalty was— that in the interest of justice, given the penalty, the jury could nullify the end result by jury nullification, vote for not guilty on that basis, that the penalty would not cause justice to be done." "And he talked about—well, when he was—had researched the law on jury nullification. He introduced that part of his dialog, that on a marijuana case—you know, something to that effect."

The trial court asked Juror No. 5 whether a juror was "presently" not willing to follow instructions, and Juror No. 5 responded, "No. Yesterday I would have said yes." Juror No. 5 explained that "from yesterday to today, [Juror No. 10 has] reflected or changed his mind and he's trying to reword his opinion to more go in line with what would follow instructions, if that makes sense."

Juror No. 6 told the trial court that Juror No. 10 "changed his position several times. Yesterday, yeah, he was talking about [not following the court's instructions], and today it seems like he's changed his position." Asked if Juror No. 10 was willing to follow the court's instructions, Juror No. 6 responded, "That's what he says, yeah."

Juror No. 7 told the trial court that Juror No. 10 was not following the court's instructions. "He said that he will not get in trouble for disregarding rules. He doesn't have to look at evidence, things of that sort."

Juror No. 8 told the trial court, "I believe today he's following instructions. Yesterday things were a bit more tangential."

5

Juror No. 9 told the trial court that Juror No. 10 did not "care about what the rules are or what the instructions were. Those were merely opinions on how we should follow them. They didn't care about what we swore to agree to in the jury selection process. And they are mostly focused on the resulting punishment after our—after we charge them with one crime or another. They're mostly focused on the punishment instead of the actual charges and facts at hand." Asked when those statements were made, Juror No. 9 responded, "It was mostly yesterday. And today he came in claiming that he was suddenly following all the rules, but it made the other eleven people in the room uncomfortable because of all of the rash statements he was making yesterday and how quickly he was set to defend them without changing his mind."

When it was his turn, Juror No. 10 accused Juror No. 11 of not following instructions. Juror No. 10 told the trial court that Juror No. 11 "said that the evidence needs to be considered as fact, including testimony. And I keep trying to tell them that we are—that it's a judgment call on the testimony. But he seems to think that we need—that anything—any testimony given is supposed to be considered honest truth." Asked if anyone has talked about jury nullification, Jury No. 10 responded, "That was me. I brought that up yesterday in an attempt to sway the other jurors to my position. I brought that up as an alternative to considering the evidence and whatnot. And once I was informed of—that we're not supposed to consider that possibility, I withdrew that and maintained my position based on the evidence." Asked if he had considered punishment for any reason, Juror No. 10 responded, "At the very beginning, but that was—I had already decided based on the fact that all the evidence had come from this one person that that hadn't proved the case beyond a reasonable doubt in my mind. So I

figured whatever I thought about jury nullification or punishment was irrelevant."

Juror No. 11 told the trial court that Juror No. 10 was not following the court's instructions because "[h]e doesn't believe—take the testimony as truth. It could be faked." Asked by the court, "is that the only reason you believe he's not willing to follow the instructions," Juror No. 11 responded, "Yes, he says anybody can be faked. [¶]. . .[¶] So that's why there's a reasonable doubt." The court reminded Juror No. 11 that the jury's job was to determine whether a person who testifies is telling the truth and asked if anyone has said anything else about not being willing to follow the court's instructions. Juror No. 11 answered, "Not today," but that "[y]esterday," Juror No. 10 said "we can make any decision we want and that your rules don't need to be followed."

Juror No. 12 told the trial court that "[y]esterday," Juror No. 10 said "[h]e doesn't like the consequences that will come from the first count being charged."

Following the interviews with each juror, the trial court heard arguments from counsel for both sides before announcing its decision to discharge Juror No. 10. The court first noted that Juror No. 10, "by his own admission, . . . stated that he discussed punishment and jury nullification with the other jurors. And we heard details of how he discussed punishment. He talked about consequences of a felony conviction, that a person could lose their voting rights, they could lose their rights to own or possess firearms." The court acknowledged that "[t]oday, Juror number 10 says he's not considering punishment, he's . . . willing to now follow the instructions. He wasn't willing yesterday. [¶] The instructions were pretty clear, and he understood the instructions yesterday because anyone that discusses jury

7

nullification, especially in the manner that he did, knows that he's not following my instructions.

The trial court continued, "I do question [Juror No. 10's] credibility. He was dishonest yesterday when he went into jury deliberations and was trying to convince eleven jurors to do as he was doing which was disregarding the law. Even though he's saying the right things today, I can't see how allowing a person who's—who yesterday all day willfully violated the instructions and tried to inappropriately convince the jury to come to a decision not based on the evidence, not based on the law, but based on things that they were specifically instructed not to consider, primarily the sentence and jury nullification issues. . . . [I]f I allow a juror like this to stay on the jury, it compromises the integrity of this trial and any decision the jury would reach." Finally, the court remarked, "You can't just go into a jury room, ignore the law, talk about jury nullification when you know that you're not supposed to do that, talk about consequences of a conviction when you know you're not supposed to do that, and then when you're called on it, tell the judge, 'Well, I'm not going to consider those now.' "

After stating its findings, the trial court discharged Juror No. 10 and replaced him with an alternate. The jury then deliberated for just over half an hour before announcing that it had reached a verdict. The jury found defendant guilty as charged on count one. In the bifurcated proceedings, defendant admitted the three prior domestic violence convictions. The court sentenced defendant to five years in prison and imposed various fines and fees, including a $90 criminal justice administrative fee pursuant to Government Code former section 29550, subdivision (c).

Defendant appealed.

8

## A. Discharge of Juror No. 10

A trial court may discharge a juror for good cause (§ 1089),[4] which includes a failure to follow the court's instructions. (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 69–70 (*Allen and Johnson*).) A juror who "refuses to follow the court's instructions is 'unable to perform his duty' within the meaning of Penal Code section 1089." (*People v. Williams* (2001) 25 Cal.4th 441, 448.)

"Great caution is required in deciding to excuse a sitting juror. A court's intervention may upset the delicate balance of deliberations. . . . The fact that other jurors may disagree with a panel member's conclusions, or find disagreement frustrating, does not necessarily establish misconduct. [¶] Because of the importance of juror independence, review of the decision to discharge a juror involves ' "a somewhat stronger showing" than is typical for abuse of discretion review. . . .' [Citation.] The basis for a juror's discharge must appear on the record as a ' "demonstrable reality" ' and 'involves "a more comprehensive and less deferential review" than simply determining whether any substantial evidence' supports the court's decision. [Citation.] The reviewing court does not reweigh the evidence but looks to see whether the court's ' "conclusion is manifestly supported by evidence on which the court actually relied." [Citation.]' [Citation.] This heightened standard is used by reviewing courts to protect a defendant's fundamental rights to due

---

[4] Section 1089 provides in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

process and a fair trial, based on the individual votes of an unbiased jury [citation], which are also hallmarks in American jurisprudence." (*Allen and Johnson*, *supra*, 53 Cal.4th at p. 71.) In making its findings, the trial court may rely on other jurors' recitations of what the discharged juror said, "[a]nd a reviewing court defers to the factual determinations the trial court makes when assessing the credibility of the jurors, who may offer conflicting accounts." (*Id.* at p. 75.)

We conclude the trial court's discharge of Juror No. 10 was not an abuse of discretion because the juror's refusal to follow instructions appears in the record as a demonstrable reality and manifestly supports the court's decision. As the court noted, Juror No. 10 admitted he brought up the topic of "jury nullification" and attempted to persuade other jurors to find defendant not guilty because of the potential penalties for the charged offense. Jury nullification "is a jury's 'defiance of the law' " and " ' "is, by definition, a violation of a juror's oath to apply the law as instructed by the court." ' " (*People v. Estrada* (2006) 141 Cal.App.4th 408, 414, 410.) Not only did Juror No. 10 mention the topic, he explicitly told the other jurors he was entitled to disregard the court's instructions and would find defendant not guilty on count one because of the potential criminal penalties defendant would face. This contravened the court's clear and repeated admonitions—given during voir dire, at the start of trial, and prior to guilt phase deliberations—that the jurors must follow the instructions and the law as explained by the court and reach a verdict without consideration of punishment. (See *People v. Engelman* (2002) 28 Cal.4th 436, 442 [in cases not involving death penalty, punishment should not enter into jury's deliberations].)

This was not simply a misunderstanding of the instructions. Juror No. 10 openly expressed to his fellow jurors that he researched the law on jury nullification and that he would suffer no consequences for his disobedience of the rules. Even though the trial court explained to all the jurors that jury nullification constituted a violation of their oath, the foreperson reported shortly thereafter that Juror No. 10 persisted in his claim that he could "disregard the facts" due to his "opinion that the law and punishment would be unjust on the first count/charge." Other jurors corroborated the foreperson's account of Juror No. 10's statements. On the second day of deliberations, the foreperson reported the jury was still deadlocked because Juror No. 10 was "disregarding instructions and ignoring laws" and stating he would not change his decision because " 'no jury has been punished for not following rules.' " On this record, the evidence that Juror No. 10 was refusing to follow instructions was a demonstrable reality.

Defendant disputes this conclusion and maintains that Juror No. 10 was simply trying, somewhat inartfully, to articulate his view that the prosecution's case lacked merit. As recounted above, Juror No. 10 told the trial court during individual questioning that he raised the issues of jury nullification and punishment as "alternative[s]" to his arguments about the evidence, and that once he was admonished by the court regarding jury nullification, he "withdrew that and maintained [his] position based on the evidence." However, the trial court was not bound to accept Juror No. 10's post hoc characterization of the jury's deadlock as a dispute over evidence, as the record manifestly supported the court's finding to the contrary. In particular, the foreperson's notes, sent within the first couple hours of deliberations on the first day, pertained solely to jury nullification and punishment, with no mention of a disagreement over the evidence, and Juror

11

No. 4 told the trial court that "[t]he first words out of [Juror No. 10's] mouth" involved his consideration of punishment. Meanwhile, Juror No. 1 told the trial court that Juror No. 10 had, in fact, agreed that defendant was "over 50 percent guilty" but would not vote to convict, citing jury nullification. On this record, the court could reasonably conclude that Juror No. 10's position on jury nullification and punishment was the basis for the deadlock.

Defendant argues, nevertheless, that the trial court improperly ignored statements from other jurors who corroborated Juror No. 10's explanation of a disagreement over the evidence. Citing *People v. Cleveland* (2001) 25 Cal.4th 466, 483 (*Cleveland*), defendant argues that the court erred in discharging Juror No. 10 because there was a " ' "reasonable possibility" ' " that the impetus for his dismissal was his views on the merits of the case. We are not persuaded.

As a legal matter, *Cleveland* offers no assistance to defendant because it set forth the " 'any reasonable possibility' " standard under federal authorities only to reject it and to reaffirm the " 'demonstrable reality' " test under California law. (See *Cleveland, supra*, 25 Cal.4th at p. 484, italics omitted [rejecting the federal standard promulgated in *U.S. v. Brown* (D.C. Cir. 1987) 823 F.2d 591, and refined in *U.S. v. Thomas* (2d Cir. 1997) 116 F.3d 606 and *U.S. v. Symington* (9th Cir. 1999) 195 F.3d 1080].) And as a factual matter, there was but a single juror—Juror No. 11—who made reference to a separate disagreement with Juror No. 10 over the jury's role in evaluating witness credibility. But the record confirms that no other juror attributed the deadlock to a disagreement over the evidence, and Juror No. 11 otherwise corroborated the other jurors' accounts that Juror No. 10 refused to follow the court's instructions. Thus, despite Juror No. 11's reference to a separate disagreement over the evidence, the balance of the

12

record showed to a demonstrable reality that Juror No. 10 would not perform his duties.

Defendant further contends it was an abuse of discretion to discharge Juror No. 10 because he agreed to follow the trial court's instructions once he was admonished to not discuss jury nullification and punishment. But the court was not required to believe that Juror No. 10 had a sudden change of heart given his open flouting of the instructions the previous day. "[T]rial courts are frequently confronted with conflicting evidence on the question whether a deliberating juror has exhibited a disqualifying bias. [Citation.] 'Often, the identified juror will deny it and other jurors will testify to examples of how he or she has revealed it.' [Citation.] In such circumstances, the trial court must weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings. We defer to factual determinations based on these assessments." (*People v. Lomax* (2010) 49 Cal.4th 530, 590.)

Defendant next argues that the trial court never made an express credibility determination to which we must defer. But the totality of the court's remarks plainly demonstrates its disbelief of Juror No. 10's post-admonishment claim that he was willing to follow the court's instructions. In openly "question[ing Juror No. 10's] credibility," the court stated that Juror No. 10 "was dishonest" on day one when he inappropriately sought to persuade others to join him in disregarding the instructions and the law. And even though Juror No. 10 was "saying the right things" on day two, the court found he was doing so only because he was "called on it" by the other jurors and the court. Juror No. 10's open defiance of the court's clear and repeated instructions on the law and its admonishments to not consider punishment and jury nullification provided ample reason for the court to

question his veracity and willingness to follow instructions. As the trial court was in the best position to observe Juror No. 10's demeanor firsthand, we defer to the court's determination as to his credibility. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053.)

Defendant's reliance on *People v. Salinas-Jacobo* (2019) 33 Cal.App.5th 760 (*Salinas-Jacobo*) is misplaced. There, the trial court discharged a juror for considering punishment and evidence outside the record and for not following the court's instructions on the burden of proof. (*Id.* at p. 762.) The record showed that the dissenting juror was " 'difficult to reason with' " (*id.* at p. 764) and was " 'having a very hard time explaining where their reasonable doubt is coming from and pointing to the facts that are giving them reasonable doubt.' " (*Id.* at p. 767.) There were also conflicting accounts as to whether the dissenting juror discussed a " 'higher standard' " of proof and brought up the issue of punishment during deliberations. (*Id.* at pp. 771– 774, 778–779.)

Our colleagues in Division Two held that the trial court's decision to discharge the dissenting juror was not manifestly supported by the evidence on which the court relied. Specifically, the trial court never identified any evidence outside the record that the discharged juror considered, and the juror's consideration of punishment was "not borne out in the record by substantial evidence." (*Salinas-Jacobo*, *supra*, 33 Cal.App.5th at pp. 777– 778.) As for the juror's failure to follow instructions on the burden of proof, *Salinas-Jacobo* found there was no evidence that the dismissed juror refused to follow the law, and that "[a]t bottom, it appears that Juror No. 11 'fail[ed] to agree with the majority of other jurors [and] persist[ed] in expressing doubts about the sufficiency of the evidence in support of the majority view' and had trouble 'articulat[ing] the exact basis for disagreement after a

14

complicated trial,' but these circumstances do not amount to juror misconduct. [Citation.]" (*Id.* at p. 780.) In concluding the juror's discharge was error, *Salinas-Jacobo* explained "it is not a ground to discharge a juror because he 'relies upon faulty logic or analysis' [citation], or because he ' "does not deliberate skillfully or well" ' [citation]." (*Ibid.*)

Here, in contrast, Juror No. 10's refusal to follow the trial court's instructions was clearly borne out in the record. The other jurors described Juror No. 10's statements in detail, and Juror No. 10 admitted that he had considered punishment and advocated for jury nullification during deliberations. Moreover, as explained, the evidence does not compel the conclusion that Juror No. 10 was merely having trouble explaining his position on the merits of the case. To the contrary, Juror No. 10 very clearly explained his position that, based on his research, he had the right not to follow the court's instructions and the law because he believed the punishment flowing from a felony conviction would be unjust. The only factual question for the trial court was whether it should believe Juror No. 10's claim on day two that he would follow instructions going forward, and we defer to the court's credibility determination in that regard.

In short, we conclude the basis for the trial court's discharge of Juror No. 10—his open refusal to follow the trial court's instructions—appears on the record as a demonstrable reality. Thus, the discharge was manifestly supported by the evidence on which the court actually relied, and no abuse of discretion appears. (*Allen and Johnson*, *supra*, 53 Cal.4th at p. 71.)

**B. Criminal Justice Administration Fee**

After defendant was sentenced, and while this appeal was pending, the Governor signed Assembly Bill No. 1869 (2019–2020 Reg. Sess.) (Assembly Bill 1869) into law. "Effective July 1, 2021, Assembly Bill 1869 'eliminate[d]

15

the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and . . . eliminate[d] all outstanding debt incurred as a result of the imposition of [identified] administrative fees.' " (*People v. Greeley* (2021) 70 Cal.App.5th 609, 625.) As relevant here, Assembly Bill 1869 added Government Code section 6111, which provides in pertinent part: "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . subdivision (c) or (f) of Section 29550 . . . is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."

The People concede, and we agree, that under the plain language of Government Code section 6111, the portion of the judgment imposing any amounts of the criminal justice administration fee that remain unpaid as of July 1, 2021, must be vacated.

### DISPOSITION

The judgment is modified to vacate any portion of the criminal justice administration fee that remained unpaid as of July 1, 2021. As modified, the judgment is affirmed. The clerk of the superior court is directed to modify the abstract of judgment as set forth above and to transmit the modified abstract of judgment to the Department of Corrections and Rehabilitation.

16

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Rodríguez, J.

*People v. Alvarado* (A161578)

17