# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

TIMOTHY JOSEPH MCGHEE,
Defendant and Appellant.

S169750

Los Angeles County Superior Court
BA244114

April 3, 2025

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, Jenkins, and Evans concurred.

PEOPLE v. MCGHEE

S169750


Opinion of the Court by Liu, J.


A jury convicted Timothy Joseph McGhee of three counts of first degree murder and four counts of attempted murder. (Pen. Code, §§ 187, 664, subd. (a); all undesignated statutory references are to the Penal Code.)  The jury found true the special circumstances that he committed multiple murders (§ 190.2, subd. (a)(3)) and that he committed two of the three murders while participating in, and for the benefit of, a criminal street gang (§ 190.2, subd. (a)(22)).  The original jury deadlocked as to penalty.  On retrial of the penalty phase, a different jury returned a verdict of death.  McGhee's appeal is automatic. (§ 1239, subd. (b).)

Because of the erroneous discharge of a juror during guilt phase deliberations, we must reverse McGhee's conviction and sentence.

## I.  FACTUAL BACKGROUND

### A.  Guilt Phase

#### 1. *Prosecution case*

McGhee was a high-ranking member of the Toonerville street gang.  The charges against him in this case stemmed from five separate gang-related shootings that occurred around Atwater Village in Los Angeles between October 1997 and November 2001.

The prosecution's evidence showed that the first shooting, in October 1997, was directed at Rascals gang members Juan

Cardiel and Pedro Sanchez. Cardiel and Sanchez were standing outside a gas station when two cars approached. After the occupants of one car displayed a rifle, Cardiel and Sanchez heard gunfire and ran away, with a gunman in pursuit. Cardiel was shot in the back and leg, paralyzing him from the waist down. Sanchez was hit in the back but ran into the gas station minimart, where the shooter shattered the glass door with gunfire and left the scene. At the time, Cardiel and Sanchez were under the influence of LSD and alcohol, and their subsequent identifications of McGhee were ambiguous. The jury acquitted McGhee of the two attempted murder charges based on this incident.

Ballistics evidence showed that the same firearm involved in the gas station shooting was used four days later to kill Ronald Martin, a member of the rival Frogtown gang. Martin had been shot 27 times by at least two firearms. A former Toonerville member testified at trial that McGhee had once described the shooting to him. According to that witness, McGhee explained that he and another Toonerville member were in Frogtown territory looking to avenge the death of a fellow gang member when they spotted Martin by himself. They confronted him, asked where he was from, and demanded he lift his shirt, revealing a Frogtown tattoo. McGhee and his companion then shot Martin.

Fellow gang members also implicated McGhee in the fatal shooting of Ryan Gonzalez in June 2000. One of the witnesses recounted the following: While he was driving McGhee and other Toonerville gang members home from a party, McGhee directed him to exit the freeway in a rival gang's territory. They spotted Gonzalez, a Rascals gang member, walking alone. After driving past Gonzalez several times, McGhee got out of the

vehicle. Armed with the witness's handgun, McGhee chased Gonzalez down a side street and opened fire. According to the witness, McGhee continued to click the trigger and mutter something even as Gonzalez lay lifeless on the ground before he returned to the vehicle. Another gang member witness testified that McGhee stated after the shooting, " 'I blasted that fool.' "

Ballistics evidence connected the gun used in the Gonzalez shooting to a police ambush that occurred one month later in July 2000. In the early morning hours on that day, a man on his way to work was robbed outside his home by three men armed with machine guns. He reported that the men took off in a gold Honda. Police located the vehicle and gave chase. During the pursuit, the patrol car with two officers was hit four times by gunfire, both from behind and from the Honda. Although the gunshots made a hole in one officer's pant leg, neither officer suffered serious injury. Once the Honda slowed, the officers managed to crash into and disable it. After a brief exchange of gunfire, the occupants were taken into custody.

A former gang member told the jury that McGhee and others were listening to a police scanner around the time of that robbery. McGhee and two other men armed themselves and left the apartment to help their fellow gang members, who by then had returned to the neighborhood with the police still in pursuit. After the shooting, McGhee said "they dumped on the cops," which the witness understood to mean that McGhee and another gang member had been shooting at the police.

The other prosecution witness who implicated McGhee in the police ambush was John Perez, a 17-year-old Police Explorer with the Los Angeles Police Department who lived on the street where the shooting occurred. He watched the events unfold as

he stood on a bathtub peering out of his bathroom window. Although he admitted that he initially told police and neighbors he had not seen anything, and although he explained he feared retaliation, he eventually reported seeing McGhee on the sidewalk shooting at the officers' vehicle.

Another gang-related shooting occurred about 16 months later, in November 2001. Several hours before that incident, a Toonerville gang member had been fatally shot by a rival gang. Duane Natividad was a member of the Pinoy Real gang, which the Toonerville gang considered a rival. He was driving with his girlfriend, Margie Mendoza, and a friend, Erica Rhee, around midnight when someone opened fire on them. Natividad and Mendoza were hit, and Mendoza died from her injuries.

Natividad admitted at trial that he had an extensive criminal record, and he repeatedly said he could not remember anything he told the police about the incident. Police detectives testified that Natividad identified McGhee as the shooter in a photographic lineup two months after the shooting and again about one year later when he and fellow gang members were pulled over and questioned by a patrol officer.

Monica Miranda, a houseguest who was staying near the location of the shooting, described her observations before and after the incident. She testified that she saw two cars pass by her location late at night and noticed that one of the passengers had a tattoo on the back of his head. After hearing gunshots and moving her sleeping children to another part of the house, she went back outside and stood behind a tree, where she watched two men shooting. She also testified that from her vantage point, she saw that one of the shooters had a tattoo on the back

of his head and that the door of the passenger side where he had been riding was open.

Miranda testified further that the car in which she believed McGhee was riding left the scene but then briefly returned to the area, and that she overheard two men talking about looking for "something" they had dropped. A short time later, Miranda said, she was approached by a woman who she thought was behaving suspiciously. The woman said she was looking for something she had lost. The woman then said into a cell phone, " 'We got 'em,' " jumped into the air, and took off in a black Toyota 4Runner.

The woman turned out to be a Toonerville gang member named Christina Duran, who was soon pulled over by police after running a red light near the scene of the shooting. McGhee was riding in the cargo area of her vehicle. Miranda, who had told police she saw the 4Runner on the street shortly before the shooting, was brought to a field lineup where she identified the driver as the woman who previously raised her suspicions.

Duran was taken to the police station for questioning, and she eventually implicated McGhee in the shooting. According to her statement, McGhee had contacted her soon after the shooting and told her that he and another Toonerville gang member had gotten into a gunfight and that he dropped his cell phone. McGhee wanted Duran to help him look for it because he was worried that if the police found it, he "could go down for something, for, for murder."

The police recovered the missing cell phone, which was linked to McGhee. Cell phone records showed the last call occurred shortly before the shooting.

Miranda later admitted to police that she did recognize McGhee as one of the shooters after seeing the tattoo on the back of his head at the field lineup, but that she did not want to speak up at the time. By then, McGhee had left the area. He was apprehended in Arizona in February 2003.

### 2. *Defense case*

Through cross-examination in the prosecutor's case-in-chief and the presentation of defense witnesses and exhibits, the defense sought to show that every witness who implicated McGhee in one or more of the five shooting incidents was unreliable and should be discredited. During the prosecution's case, defense counsel elicited testimony to support three primary points. First, the witnesses who implicated McGhee in the shootings admitted being under the influence of drugs or alcohol, or both, either at the time of the incidents or when McGhee allegedly admitted his involvement. Second, cross-examination disclosed evidence that the prosecution's principal witnesses had been coached by police detectives during unrecorded pre-interviews before making their recorded statements. Third, cross-examination suggested that some of these witnesses had a motive to lie. After implicating McGhee in the shootings, they obtained favorable treatment with respect to their own criminal liability, such as immunity from prosecution for the present crimes, no charges filed, or dismissal of charges in unrelated cases.

The defense witnesses provided further evidence casting doubt on the testimony and statements of the prosecution witnesses who implicated McGhee. For example, a friend of a key prosecution witness testified that over the course of several conversations, the witness told her that he was the one who had

killed Martin and Gonzalez and had shot at the officers during the police ambush.

Two other defense witnesses — one who lived on the street where the police ambush occurred and another who lived near where Mendoza was killed — contradicted the accounts of those shootings given by the prosecutor's eyewitnesses.

## B. Penalty Phase

### 1. *Prosecution evidence*

The jury that decided McGhee's guilt of the charged crimes deadlocked on penalty, and the court declared a mistrial. A new jury was empaneled and presented with extensive testimony and other evidence regarding the three murders and four attempted murders of which McGhee had been convicted.

The prosecutor also offered evidence of numerous acts of violence or threats of violence allegedly committed by McGhee while in custody or out, and as a juvenile or an adult. (§ 190.3, factor (b).) Among those violent acts was McGhee's involvement in an inmate riot at the Los Angeles County Men's Central Jail in January 2005 while he was awaiting trial in his capital case. Through testimony by sheriff's deputies and a videotape of the incident, the prosecutor sought to establish that McGhee instigated and participated in the riot. That evidence showed that McGhee and other inmates broke the porcelain sinks inside their cells and hurled the shards at the deputies, along with food and what deputies described as a mixture of urine and other liquids.

Another significant piece of the case in aggravation was the evidence of McGhee's involvement in the execution-style murder of Christina Duran. The penalty phase jury viewed Duran's videotaped statement to police, in which she told

detectives that McGhee had admitted to her that he and another Toonerville member, Eduardo "Limpy" Rodriguez, had engaged in a gunfight with someone in the car in which Mendoza was riding. According to Duran, McGhee said that if the police found the cell phone he had dropped during the incident, he "could go down . . . for murder." Duran was released shortly after giving her statement. Within hours of her release, arrest and search warrants were issued for McGhee and Rodriquez. Although the testimony was conflicting, the prosecutor elicited evidence that McGhee directed Duran's boyfriend to bring Duran to a birthday party in her honor on the second night after her release from custody so that the "homies could get at her" for ratting on him. Other witnesses placed McGhee at the party and saw him and another Toonerville member driving behind Duran's car when she left with her boyfriend in the early morning hours. Duran's body was found inside her car the next afternoon, about two miles from the party. According to the medical examiner, she had been shot five times in the head at close range while her head was being held back in a fixed position. A neighbor reported to police that she heard a woman screaming to be let go and two or three men yelling at her. She then heard gunshots.

The prosecutor also presented victim impact testimony from family members of the three murder victims.

### 2. *Defense evidence*

The defense case in mitigation challenged the prosecutor's evidence regarding McGhee's involvement in the jail riot and Christina Duran's murder. The jury also heard testimony from a number of McGhee's family members and friends, who described the love and care he provided his mother and

grandmother when they became ill, his positive effect on their lives, and the hardships he suffered growing up. Specifically, witnesses testified that McGhee, who was overweight as a child and light-skinned, was picked on by the neighborhood children and often came home from elementary school with dirty clothes and a bloody nose.

## II. DISCHARGE OF A JUROR DURING GUILT PHASE DELIBERATIONS

McGhee contends that the trial court erred when it discharged a juror during guilt phase deliberations for failing to deliberate and for bias against the police and the prosecution. As explained below, the record does not support as a demonstrable reality the court's ruling that the discharged juror was unable to fulfill his duties as a juror. (§ 1089.) The court's ruling therefore was an abuse of discretion.

### A. Procedural Background

The jury began its deliberations on a Monday afternoon and deliberated for half of the next day. The jury resumed deliberations on the following morning and deliberated the entire day.

At the end of that third day, after the jury had been deliberating for almost 10 hours, the court received the following note from two jurors: "We, Jurors Number Nine and 11, feel that the majority of the jury feels as though one juror, Number Five, has been swayed and is not capable of making a fair decision in any of the counts against McGhee. [¶] Juror Number Five is using speculation as facts and has no rational explanation as to why he feels the way he does other than saying every prosecution witness was coached and lying. Yet the defense witnesses are all telling the truth and believable."

The jury continued its deliberations the following morning. Meanwhile, the court read the note to counsel for both sides and, over defense objection, decided that it would make an inquiry into the accusations against Juror No. 5. At that point, the court directed the jury to stop deliberating.

The court first questioned Juror No. 9 about the note's assertion that Juror No. 5 was using "speculation as facts." Juror No. 9 indicated that when discussing the testimony of certain eyewitnesses, Juror No. 5 would say, without a "reasonable alternative explanation," that "I just don't think they saw it." For example, Juror No. 9 explained, Juror No. 5 did not believe Monica Miranda's testimony regarding the Margie Mendoza killing because, under his reasoning, "why would Miranda go outside when she heard shooting? . . . She's a single mom with kids . . . ." As for John Perez, who testified about the police ambush, Juror No. 9 reported that Juror No. 5 had said he did not believe Perez because "if I heard shots I would fall onto the floor and try to protect myself." In response to questioning by the court, Juror No. 9 said that Juror No. 5 was not fairly deliberating because he was biased and was not considering what others were saying about the evidence. As to bias, Juror No. 9 asserted that when Juror No. 5 was explaining his views, he said he believed all the witnesses were coached by the police but did not point to anything in the record to support that view.

The court next examined Juror No. 11, who also said Juror No. 5 was "using speculation as facts." Juror No. 11 believed there was no evidence that Perez had been charged with any crime, yet Juror No. 5 had said he "wasn't prone to accept anybody's testimony from the prosecution because everybody has convictions . . . ." Juror No. 11 also testified that Juror No. 5

made statements suggesting bias against the police or the prosecution. For example, Juror No. 5 said that he "doesn't like the cops in this case" and that he does not trust the prosecution witnesses because they have been coached by the police and did not come forward to police shortly after the incidents. Finally, Juror No. 11 said that although Juror No. 5 was listening to what the other jurors were saying, he had already made up his mind. According to Juror No. 11, at one point during deliberations Juror No. 5 said to the rest of the jury, "I am not changing my mind. I can convince you people to change your minds."

The court then questioned the jury foreperson, Juror No. 4. The foreperson believed that Juror No. 5 had an "agenda" and that he contradicted the other jurors "without really engaging in conversation." He said that Juror No. 5's reasoning was "beyond reasonable. It's irrational." According to the foreperson, Juror No. 5 was "not shut down" and "he's not not talking. But he's not making sense either." In the foreperson's opinion, Juror No. 5's views on the evidence were "not coming from what we heard." The foreperson further believed that Juror No. 5 was prejudiced against the police and compassionate toward gangs. For example, Juror No. 5 said he did not believe any gang member who testified against another gang member because "a gang member wouldn't do that."

The court next examined four more jurors. Juror No. 10 said Juror No. 5 "speculates about everything" and is "not making sense." According to Juror No. 10, Juror No. 5 stated that prosecution witness Recio had been arrested for two murders, but that statement was not supported by the evidence. Juror No. 10 also believed that Juror No. 5 was biased against the police and had an agenda. According to Juror No. 10, Juror

No. 5 cannot accept the testimony of witnesses who have a prior conviction because "they all have something to gain."

By contrast, Jurors Nos. 1, 2 and 6 said that deliberations were going well and that they perceived no bias on the part of any jurors. Juror No. 1 indicated that no one had speculated improperly, and when someone said something that was not shown by the evidence, the other jurors pointed that out. Juror No. 2 said that none of the jurors had shown a preset idea or bias and characterized the situation as one in which one juror was just leery of testimony from all witnesses. Juror No. 6 stated that deliberations were "going as they're supposed to go," with everyone being open-minded and engaging in open discussion on the evidence.

Over defense objection, the court decided to hear from the remaining four jurors and then Juror No. 5.

Juror No. 3 said that it was not clear Juror No. 5 had "an agenda" but that what he says "doesn't seem very rational or logical" and that he relies on "complete speculation." For example, Juror No. 5 repeatedly expressed his view that the prosecution witnesses were coached and that their stories seemed "too clear for that particular witness." According to Juror No. 3, Juror No. 5 also was not fairly deliberating. When certain jurors tried to argue with him, he shut himself off; with others, his answers "[didn't] make sense." Juror No. 5 also had "hinted" at bias against the police by his insistence that the witnesses were coached.

When asked whether any jurors were refusing to follow the law, Juror No. 7 said "[t]here is some speculation. There is definitely difference of opinions. Other than that I think it's healthy discussions in there . . . ." As to Juror No. 5, Juror No. 7

said, "I myself have . . . explained . . . to Juror Number Five, that an open mind is needed to be able to interpret the testimony and what the evidence showed in order to come to a reasonable conclusion. . . . It's a little difficult for him . . . to go past certain hurdles that I believe in his mind he has kind of set." When the court asked if Juror No. 5 "ha[s] an agenda of some kind," Juror No. 7 said, "I am not too sure about that. . . . What I see is a little narrowness in his way of thinking." When asked if Juror No. 5 had "an anti-police bias," Juror No. 7 said, "In interpreting his not coming forth and giving any reasonable dialogue as to why he thinks the way he does, I interpret it as that."

Juror No. 8 described Juror No. 5 as "a little, I would say, hardheaded; I don't know if he's willing to change his mind or anything like that, I mean, we've tried talking." Juror No. 8 said that Juror No. 5 had been dodging questions about his belief that all prosecution witnesses had been coached and that "[h]e is starting to talk a little more now. I don't know if it's changing or anything." When asked if Juror No. 5 was "biased or prejudiced in some way," Juror No. 8 said, "He might be, yeah. Although — like I said, he's starting to talk a little more. But I don't know if he's going to change." Juror No. 8 further said that "yesterday he started to, I guess, open up a little. Because they were kind of like jumping on him. So it looked like he was getting a little more hardheaded, you know, like everyone was against him . . . . [¶] I took the impression that he started maybe to open up a little but I don't know if he's going to — ."

Juror No. 12 testified that when Juror No. 5 was asked about his position regarding the prosecution witnesses having been coached, he ignored the question. In Juror No. 12's opinion, Juror No. 5 seemed to have a bias against the police.

After having questioned all members of the jury except Juror No. 5, the court informed the attorneys that it was leaning toward dismissing him. It then called Juror No. 5 into the courtroom for questioning.

Juror No. 5 denied telling the other jurors that he believed all the prosecution's witnesses had been coached or that he would never believe someone who had a felony conviction. Juror No. 5 also denied he was prejudiced against the police and in favor of gangs. He thought he was deliberating fairly and was supporting his positions. He also commented that he felt a "wave" from one or two jurors that was carrying over to others, "like they're trying to gang up on me" and "not really seeing me being logical." Juror No. 5 pointed out that there had been several instances in which another juror backed up his position using different logic.

The court removed Juror No. 5 in the following ruling:

"My job as a judge is to make sure that we have jurors that will give both sides a fair trial. And I am of the opinion that Juror Number Five is not giving and will not give a fair trial to the prosecution. And I am going to remove him for misconduct.

"A number of jurors said he was not fairly deliberating on the evidence: 9, 11, 4, 10, 3, 7, 10 [sic], 8 and 12.

"Juror No. 11 said that Juror Number Five doesn't believe persons who have convictions. That certainly is permissible, to consider a felony conviction and whether or not you want to believe someone that has a felony conviction.

"But to say that one would not believe all persons who have convictions I think is improper. I think he has gone too far.

"It raises in the court's mind whether or not this juror can and has followed the court's instructions on the law.

"Juror Number Four characterized Juror Number Five as having an agenda. That he appeared to be prejudiced towards gangs. Said gang members wouldn't do certain things.

"There's a lot of discussion from the jurors we've heard this morning about how he is speculating on the evidence and that the speculation is governing his view of the evidence.

"We heard several complaints from jurors about the fact that Number Five doesn't provide reasons. Doesn't make sense. He's not rational.

"Number 7 said there's no reason why he thinks what he does.

"Now I am well aware that the Supreme Court has told us, the fact that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge.

"It is my view when I look at the totality of the evidence we've heard this morning, what we heard was much more than faulty logic or analysis.

"We had what the court perceives to be a strong anti-prosecution bias.

"I acknowledge the defense attack on various informant type witnesses in this case. And that I remember very well your argument about, give us McGhee and we'll set you free. And I thought it was an effective way to characterize your attack on these informant witnesses.

"But I believe the jurors who tell me that this juror, Juror Number Five, has taken the position that all witnesses were

coached. I believe he was evasive when I asked him about that. He backpedaled and said, well, not all.

"I also believe he lied to the court when I asked him if he had made the statement that he believed McGhee to be innocent on all the counts.

"Well, no, he didn't say that either, he said. And I think I cannot trust the juror's responses to the court.

"I realize I put him in a difficult position but nevertheless this is a difficult matter. And it's important for the court to do what the court believes is appropriate.

"I accept the People's argument that there are two basis [sic] for excusing this juror. One is a demonstrated anti-police or prosecution bias and a failure to deliberate.

"I think that both have been sufficiently shown to the court's satisfaction; that I should excuse this juror from further participation as a juror in this case.

"I do believe he has not fairly deliberated on the evidence. And I think that my role as a judge is to make sure that both sides have jurors who will fairly deliberate on the evidence and not be engaged in speculation and the kind of blanket disregard of one side's evidence that has been demonstrated by this juror."

After the court announced its ruling but before Juror No. 5 was excused, defense counsel unsuccessfully moved for a mistrial on the ground that the court had erroneously discharged a deliberating juror who had adopted the defense position. The court said it "felt compelled" to rule the way it did "in fairness to both sides in the process of justice."

The court appointed an alternate to replace Juror No. 5, and the reconstituted jury began deliberations anew. The jury

deliberated for the rest of that afternoon and for the next four court days. On the morning of the fifth day, the jury returned its verdicts, finding McGhee guilty of the three murder charges and four of the six counts of attempted murder. The jury also found true the active gang participant and multiple-murder special-circumstance allegations, and the associated gang and firearm use sentence enhancements.

**B. Discussion**

Under section 1089, a trial court may discharge a juror any time during trial, including during jury deliberations, if the court concludes the juror in question is "unable to perform his or her duty." A juror who refuses to deliberate or who is biased against law enforcement is unable to perform his or her duty within the meaning of section 1089 and may be removed. (*People v. Armstrong* (2016) 1 Cal.5th 432, 450 (*Armstrong*); *People v. Barnwell* (2007) 41 Cal.4th 1038, 1051 (*Barnwell*); *People v. Cleveland* (2001) 25 Cal.4th 466, 475 (*Cleveland*).)

A court has "broad discretion to remove a juror for cause" under section 1089. (*Barnwell*, *supra*, 41 Cal.4th at p. 1052.) But "[g]reat caution is required in deciding to excuse a sitting juror. A court's intervention may upset the delicate balance of deliberations. The requirement of a unanimous criminal verdict is an important safeguard, long recognized in American jurisprudence. This safeguard rests on the premise that each individual juror must exercise his or her own judgment in evaluating the case. The fact that other jurors may disagree with a panel member's conclusions, or find disagreement frustrating, does not necessarily establish misconduct." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71 (*Allen and Johnson*).)

Because the discharge of a deliberating juror implicates a defendant's jury trial and due process rights under the federal and state Constitutions, the standard of appellate review involves a " ' "more comprehensive and less deferential review" ' " than the substantial evidence standard we typically apply to abuse of discretion claims.  (*Allen and Johnson, supra,* 53 Cal.4th at p. 71.)  We ask whether the trial court's conclusion that the discharged juror was unable to perform his or her duty appears in the record as a " ' "demonstrable reality." ' "  (*Ibid.*)  This standard "requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established."  (*Barnwell, supra,* 41 Cal.4th at pp. 1052–1053.)  We defer to the trial court's credibility determinations to the extent they are based on firsthand observations unavailable to a reviewing court.  (*Id.* at p. 1053.)  To uphold the discharge of a juror, however, a reviewing court "must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied," considering that evidence and the court's reasons for discharging the juror in light of the entire record.  (*Ibid.*)

Here, the court articulated two bases for discharging Juror No. 5:  "a failure to deliberate" and "a demonstrated anti-police or prosecution bias."  As explained below, the record does not manifestly support either basis.

### 1. *Questioning of jurors by the trial court*

As an initial matter, we briefly address an assertion raised by McGhee's counsel at oral argument that the manner of the court's inquiry into the juror note's accusations against Juror No. 5 was flawed and contrary to our precedent.  " 'The specific

procedures to follow in investigating an allegation of juror misconduct are generally a matter for the trial court's discretion.' " (*People v. Johnson* (2021) 10 Cal.5th 1116, 1170.) But when the inquiry into possible grounds for discharging a juror occurs during jury deliberations, we have emphasized that it "should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations." (*Cleveland, supra,* 25 Cal.4th at p. 485.) "Determining whether to discharge a juror because of the juror's conduct during deliberations is a delicate matter, especially when the alleged misconduct consists of statements made during deliberations." (*Id.* at p. 484; see *Armstrong, supra,* 1 Cal.5th at p. 454 ["the removal of a seated juror for failing to deliberate is a serious matter that implicates a defendant's state and federal constitutional right to a unanimous decision by the jury" and a court's discretion to remove a juror for failing to deliberate "should be undertaken with great care"].)

After receiving a note from two jurors complaining about Juror No. 5, and after conferring with counsel, the court directed the jury to stop deliberating and questioned the note's authors individually. It then questioned the foreperson about the accusations. Over defense objection, the court continued its inquiry into possible misconduct by individually questioning all the remaining jurors except Juror No. 5, at which point it made a tentative ruling that it would dismiss him. After finally questioning Juror No. 5, the court found him to be not credible and ruled it would discharge him for a failure to deliberate and for bias against the police and prosecution.

The court was faced with an unusual situation when it received a jury note that was not from the foreperson, which may have made it difficult for the court to understand the scope

of the alleged problem. That said, the court could have begun with less invasive measures to help resolve the complaints against Juror No. 5. For example, instead of immediately conducting an extensive inquiry into the content of the jury's deliberations that had the potential to interfere with the deliberative process, the court might have reinstructed the jurors or given an enhanced instruction regarding their duty to deliberate. (See *Cleveland, supra*, 25 Cal.4th at pp. 476, 480.) The court also could have spoken first to Juror No. 5 before questioning the other jurors because Juror No. 5 may have been in the best position to respond to the accusations against him. (See *People v. Clark* (2011) 52 Cal.4th 856, 969 [the court's inquiry into possible juror misconduct at the sanity phase began with questioning the assertedly biased juror].)

Although the scenarios will no doubt vary, we again suggest that trial courts, when presented with accusations of juror misconduct during deliberations, generally should conduct as limited an inquiry as possible under the circumstances so as "to avoid intruding unnecessarily upon the sanctity of the jury's deliberations." (*Cleveland, supra*, 25 Cal.4th at p. 485.)

### 2. *Summary of evidence relating to witness credibility*

We now analyze the court's discharge of Juror No. 5 and begin with a summary of the witness credibility problems facing the prosecution.

Many of the principal witnesses who implicated McGhee in the various shootings were current or former gang members. Most, if not all, of these witnesses and others admitted they had prior convictions or had engaged in criminal activity, and some had lengthy criminal records. Some of the witnesses also admitted to being under the influence of drugs or alcohol at the

time of the shootings or when McGhee told them about his involvement in the crimes. Furthermore, no witness had willingly come forward to police with information immediately after the shootings because they were abiding by a code of silence or because they feared retaliation, or both. Finally, some witnesses claimed they could not recall they had previously identified McGhee by name or photograph in police interviews.

Notably, the prosecution's attempt to prove McGhee was the shooter in the charged crimes was based on a limited number of witnesses. Cardiel and Sanchez testified about the shooting at the gas station. Mark Gonzales identified McGhee as the shooter in the Martin, Gonzalez, and police ambush shootings. But the status of each witness as an accomplice or potential accomplice required corroborating testimony. The purported corroboration rested on Gabriel Rivas for the Martin shooting, Wilfredo Recio for the Gonzalez shooting, and John Perez for the police ambush. As for the Mendoza killing, Duane Natividad and Monica Miranda were the principal witnesses identifying McGhee as the shooter.

The trial evidence concerning the credibility of these key witnesses bears on the controversy surrounding Juror No. 5's views. Regarding the gas station shooting, for example, both Cardiel and Sanchez testified about police coaching. According to Sanchez, the officers kept throwing out the name "McGhee" and "did that a lot." Cardiel said he told the detective he could not make a positive identification but picked out five or six pictures from a photo array anyway. The officer then tried to narrow down the field by pointing, but Cardiel testified at trial he was "just guessing" when he picked out McGhee's photo.

As for the Martin shooting, Gonzales testified that after he and McGhee had been up all night under the influence of methamphetamine, McGhee told him about shooting rival gang member Martin two or three years earlier. By contrast, a defense witness who asserted that Gonzales was her drug dealer testified that he (Gonzales) had bragged to her about the killing. Gonzales was a former Toonerville gang member and had a significant criminal history; he testified under a grant of immunity and as a potential accomplice. He was also on probation for a kidnapping and felony threats case and wore restraints during his testimony because he had another prosecution pending against him.

Rivas, a Toonerville gang member with criminal convictions, was called to corroborate Gonzales's account of McGhee's role in the Martin shooting. Although he told officers in a recorded interview that McGhee admitted shooting Martin, he testified at trial that McGhee never said anything about it and that he had heard only rumors on the street. According to Rivas, the officers interviewed him for one to two hours before taking his taped statement, and during the unrecorded part of the interview, the officers told him they believed McGhee shot Martin.

During cross-examination, Rivas admitted he had a heavy drug habit and was in custody for a probation violation at the time of his police interview. He further testified that the detectives told him the probation violation charge against him would be dropped if he gave them information about McGhee. After he made his statement implicating McGhee, he was released from custody.

Regarding the Ryan Gonzalez shooting, Mark Gonzales testified he was driving when McGhee directed him into rival territory, chased Gonzalez, and shot him. The prosecution informed the jury that Gonzales was an accomplice as a matter of law. The defense emphasized that Gonzales was never prosecuted for his involvement in that murder.

To corroborate Gonzales's testimony about the Gonzalez shooting, former Toonerville member Wilfredo Recio testified that McGhee told him "I blasted that fool" after seeing graffiti honoring the death of someone with the same gang moniker as McGhee. Like Mark Gonzales, Recio testified in restraints. He had prior convictions and was serving a sentence for armed robbery at the time. During cross-examination, Recio admitted that he gave detectives information about McGhee only after his parole officer informed him that he was a suspect in a double homicide, and he further testified he was never prosecuted for those crimes. Recio denied that the interviewing officer promised he would not be charged for the homicides if he cooperated in the case against McGhee, but he also indicated that his initial 90-minute conversation with the detective had not been recorded.

As for the police ambush, Mark Gonzales testified that he was present when McGhee and others listening to a police scanner went out and fired on police cars that were pursuing fellow gang members after a robbery. Gonzales said that he did not participate in the incident but that McGhee later admitted in a phone call that he had shot at the police. During cross-examination, the defense highlighted that Gonzales was not prosecuted for his involvement in the police ambush and that he stood to gain from his cooperation with police because at the time he was facing prosecution for domestic violence and felony

threat charges. The defense also elicited that he was not sure what McGhee said during the phone call even though the detective pressed him to say he was sure, and that he had been using methamphetamine daily at the time.

The prosecution called John Perez to corroborate Gonzales's testimony about the police ambush. Perez testified that in initial police interviews he denied seeing anything but eventually provided information about McGhee after he had been arrested and was in custody for shooting out streetlights with a BB gun. No charges were filed in that incident. A defense witness testified Perez told him that he was also in trouble for impersonating an officer and that police had told him he needed to " 'cooperate or you're going to go to jail.' "

Regarding the Mendoza shooting, police detectives testified that Natividad identified McGhee as the perpetrator when shown a photographic lineup two months after the shooting and again one year later. But Natividad testified that he was on methamphetamine the night of the shooting, that everyone on the street was saying it had been McGhee, and that officers had pointed out McGhee's picture in the photo lineup.

Monica Miranda also identified McGhee as the gunman in the Mendoza shooting. She admitted during her testimony that she had been a methamphetamine user and once came to court while under the influence. Miranda testified that she stood outside and watched the shooting, but a defense witness testified that Miranda was in the house at the time and went outside only after the shooting stopped to see if anyone was hurt. Miranda said that she recognized McGhee in the field lineup after the car in which he was riding was pulled over shortly after

24

the shooting, but that she did not identify him because she did not want to be involved.

### 3. *Failure to deliberate*

As our cases explain, a "failure to deliberate" means a juror is refusing to deliberate. (*Cleveland, supra*, 25 Cal.4th at p. 485; see *Armstrong, supra*, 1 Cal.5th at pp. 451–453.) To the extent the court's discharge of Juror No. 5 for failure to deliberate meant that Juror No. 5 was refusing to deliberate, that conclusion is not manifestly supported by the record.

"A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process. . . . Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*Cleveland, supra*, 25 Cal.4th at p. 485 [providing a non-exhaustive list of the type of conduct shown by a juror who is refusing to deliberate].) In *People v. Lomax* (2010) 49 Cal.4th 530 (*Lomax*), we upheld the discharge of a seated juror in the penalty phase of a capital case where the record showed the juror would not communicate with the other jurors or explain his views and the juror himself agreed that his conscience rendered him unable to take part in deliberations. (*Id.* at pp. 587, 591, 596.) In *People v. Diaz* (2002) 95 Cal.App.4th 695, the court found no abuse of discretion in the discharge of a juror for refusing to deliberate where the record showed that she had stopped deliberating on the first day because she felt intimidated by other jurors and emotionally upset by an illness in her family. (*Id.* at pp. 704–705.)

Examples of a juror's unwillingness to deliberate include refusing to engage in dialogue at all, rejecting arguments out of hand, and physically distancing himself or herself from the group. (*Cleveland*, *supra*, 25 Cal.4th at p. 485.) But "[i]t is not uncommon, or grounds for discharge, 'for a juror (or jurors) in a trial to come to a conclusion about the strength of a prosecution's case early in the deliberative process and then refuse to change his or her mind despite the persuasive powers of the remaining jurors.'" (*Armstrong*, *supra*, 1 Cal.5th at p. 453.)

Nearly all the jurors said Juror No. 5 had been deliberating for the better part of three court days — almost 10 hours of deliberations — before the court received the note from Jurors No. 9 and No. 11 complaining about Juror No. 5. Juror No. 11 testified further that at some unspecified point during their deliberations, Juror No. 5 told his fellow jurors that he was not going to change his mind but that he would try to convince others to change theirs. "A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (*Cleveland*, *supra*, 25 Cal.4th at p. 485; see *id.* at p. 470 [concluding that the juror had been erroneously discharged after the second day of deliberations]; *People v. Barton* (2020) 56 Cal.App.5th 496, 503, 513–514 [court erred in removing a holdout juror who had deliberated for six hours over the course of two days].)

This is therefore not a case like *Lomax* or *Diaz* in which the complained-of juror avoided discussions with fellow jurors. (See *Cleveland, supra*, 25 Cal.4th at p. 485 [refusing to speak to other jurors is a type of conduct showing a refusal to deliberate].) To the contrary, the record shows that Juror No. 5 had been

engaging with fellow jurors but that he was refusing to change his mind. Jurors Nos. 1, 2, and 6 said deliberations were going well; Juror No. 4, the jury foreperson, said Juror No. 5 was "not shut down" and "he's not not talking" though "he's not making sense either"; and Juror No. 8 said "we've tried talking" and Juror No. 5 was "starting to talk a little more" and "starting to . . . open up a little," though Juror No. 8 was unsure if Juror No. 5 would change his mind.

The record also shows that Juror No. 5 shared with his fellow jurors the reasons for his view of the prosecution's evidence. According to various jurors, Juror No. 5 said that he did not think Miranda would have gone outside during the Mendoza shooting because she was a single mother, that he believed she had been drinking and doing drugs that night, and that he thought Miranda cried during her testimony because she was lying. Regarding Perez's testimony about the police ambush, Juror No. 5 said that he thought Perez would have protected himself by falling to the ground when he heard shooting rather than watching out the window, and that he believed Perez had a motive to lie because he was facing criminal charges for impersonating an officer. Juror No. 5 also expressed the view that Mark Gonzales had committed the murders and that some witnesses gave stories that seemed rehearsed. More generally, Juror No. 5 told his fellow jurors that he did not think gang members would testify against one another, that he did not believe witnesses with convictions, that he did not like the police "in this case," and that he thought witnesses were pressured to accept a deal with the prosecution or police.

It is true that Juror No. 3 said Juror No. 5 "doesn't want to participate." But her description of an interaction with him

27

during deliberations, in which she confirmed with Juror No. 5 his views about the credibility of the prosecution witnesses, contradicts her assertion. For Juror No. 3 to have been able to articulate Juror No. 5's beliefs that the witnesses were coached and had something to gain by lying, he must have been engaging in the deliberative process. (See *U.S. v. Litwin* (9th Cir. 2020) 972 F.3d 1155, 1176) [a juror's ability to describe to the court the views of the challenged juror showed there was some discussion going on].) But even were we to credit Juror No. 3's assertion that Juror No. 5 "doesn't want to participate," the record does not support the conclusion that any perceived reluctance by Juror No. 5 to participate amounted to a refusal to deliberate. The record suggests instead that Juror No. 5 recognized that his views were not shared by the other jurors and believed that they were ganging up on him. This was validated by Juror No. 8, who said that the jurors "were kind of like jumping on him" and that Juror No. 5 "was getting a little more hardheaded . . . like everyone was against him."

To be sure, several jurors expressed frustration with Juror No. 5. But a key source of that frustration was Juror No. 5's disagreement with the other jurors' views of the prosecution's evidence. "Jurors are supposed to share their own evaluations of the credibility of witnesses and the strength of the evidence. That a given juror may reach a different conclusion on these questions from those espoused by other jurors, or may do so forcefully, is not necessarily evidence of . . . a failure to deliberate." (*Allen and Johnson*, *supra*, 53 Cal.4th at p. 74.) This observation seems particularly relevant here, where the defense focused on challenging the credibility of the various witnesses who implicated McGhee in the charged crimes.

Among the complaints about Juror No. 5, Juror No. 3 said Juror No. 5 was "just going to go one way and stick to it and not make any sense [of] it or try to explain . . . it." Juror No. 9 told the court that Juror No. 5 was "not considering what others say about the evidence." The foreperson mentioned that Juror No. 5 contradicted the other jurors with "just a few words without really engaging in conversation" and that the jurors trying to reason with Juror No. 5 are "just going around in circles."

Such complaints are similar to those expressed by the jurors in *Cleveland* who claimed that one juror was not deliberating. In that case, the jurors complained that the juror at issue would discuss matters " 'that had nothing to do with the facts at hand or the case' " (*Cleveland, supra,* 25 Cal.4th at p. 471), that he was " 'taking [an] unreasonable interpretation' " (*ibid.*), that he was " 'making judgments and speculations based on his personal feelings' " (*id.* at p. 472), and that he was contradicting what the other jurors would say without answering their questions (*ibid.*). In discharging the juror for failing to deliberate, the trial court observed that he "refused to respond to 'specific questions as to elements and facts' and, instead, relied upon 'generalities.' " (*Id.* at p. 486.) We concluded that the trial court erred because the jurors' comments showed "the juror simply viewed the evidence differently from the way the rest of the jury viewed it." (*Id.* at p. 486.) We explained that although 10 jurors raised their hands when asked whether the challenged juror was not deliberating, individual questioning showed that it was the excused juror's conclusion that they objected to, and that although the juror's "approach to deliberations apparently frustrated his colleagues," it could not be said he refused to deliberate. (*Ibid.*)

In this case, the court stated that several jurors complained Juror No. 5 was not making sense or was being irrational. We have observed that "[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.) But we need not go that far here because there was an evidentiary basis for Juror No. 5's concerns regarding the credibility of the witnesses who were central to the prosecution's case. Proving that McGhee was the shooter in the various incidents depended on the trier of fact giving significant weight to the testimony of a limited number of witnesses to those crimes, and there was evidence calling into question those witnesses' credibility.

Viewing the record in its entirety, we conclude that the court's discharge of Juror No. 5 for failing to deliberate is not manifestly supported by the evidence on which the court actually relied.

### 4. *Bias against the police or the prosecution*

The trial court stated in its ruling that Juror No. 5 was not "fairly deliberat[ing]" and "will not give a fair trial to the prosecution." "[W]hen I look at the totality of the [jurors' testimony]," the court said, "what we heard was much more than faulty logic or analysis. We had what the court perceives to be a strong anti-prosecution bias." Based on the trial court's ruling as a whole, this appears to be the heart of the court's concern.

"A juror who is actually biased is unable to perform the duty to fairly deliberate" and is subject to discharge. (*Barnwell*, *supra*, 41 Cal.4th at p. 1051; see *Lomax*, *supra*, 49 Cal.4th at p. 589.) "Actual bias" is "the existence of a state of mind on the

part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C).) "[A]n impartial juror is someone 'capable and willing to decide the case solely on the evidence' presented at trial." (*People. v. Nesler* (1997) 16 Cal.4th 561, 581 (*Nesler*).)

The question of bias in this case turns not on a common understanding of the word but on a more precise definition, which focuses on whether the juror's judgment or beliefs about an issue are untethered to the facts presented at trial. (*TRC Operating Co., Inc. v. Chevron USA, Inc.* (2024) 102 Cal.App.5th 1040, 1087 ["bias" in a juror misconduct case means "a tendency to unreasonably favor one aspect of the case over others, separate and apart from the juror's consideration of the evidence and the law applicable to the case"].) The question is not simply whether a juror's views derive from a personal leaning or inclination for or against one side, but rather whether the juror's views and conclusions are based on specific evidence presented in the case.

In this case, there is no dispute that Juror No. 5 had formed a negative view of the prosecution's case, and the trial court concluded he was biased against the police or prosecution. In assessing whether the court's ruling was manifestly supported by the record, we afford deference to the court's credibility findings if supported by substantial evidence. (*Nesler*, *supra*, 16 Cal.4th at p. 582.) There may be conflicting evidence whether the juror in question has exhibited grounds for discharge. "Often the identified juror will deny it and other jurors will testify to examples of how he or she has revealed it." (*Barnwell*, *supra*, 41 Cal.4th at p. 1053.) In these

circumstances, "we afford deference to the trial court's factual determinations, based, as they are, on firsthand observations unavailable to us on appeal." (*Ibid*.) But "a trial court should be wary of relying on the opinions of jurors, rather than on its own consideration of objective facts," and "should focus on its own consideration of a juror's *conduct*." (*Allen and Johnson*, *supra*, 53 Cal.4th at p. 75; see *ibid*. ["The court cannot substitute the opinions of jurors for its own findings of fact."].)

The specific accusations of bias against Juror No. 5 that the court credited were not well founded, relied on the opinion statements of other jurors, and did not manifestly support the court's discharge decision. To support their view that Juror No. 5 was biased, several jurors cited Juror No. 5's belief that the prosecution witnesses were not credible because they had prior convictions. In its ruling, the trial court credited the testimony of Juror No. 11 to support its finding that Juror No. 5 refused to accept the testimony of all prosecution witnesses with a prior conviction. The court said it "certainly is permissible, to consider a felony conviction and whether or not you want to believe someone that has a felony conviction. But to say that one would not believe all persons who have convictions I think is improper. I think he has gone too far."

The record as a whole does not manifestly support the court's finding that Juror No. 5 "would not believe all persons who have convictions." Juror No. 11 testified that Juror No. 5 "wasn't *prone* to accept anybody's testimony from the prosecution because everybody has convictions." Thus, the court's paraphrasing of that testimony may have overstated the record, which shows the jurors were less categorical on that point. Several jurors testified that Juror No. 5 had other or additional reasons for disbelieving the prosecution's

32

witnesses — i.e., they had been coached by the police, had failed to come forward to identify McGhee soon after the shootings, or had received personal benefits by implicating McGhee. In light of the many reasons for Juror No. 5's disbelief of the prosecution's witnesses, the trial court's doubt as to "whether or not this juror can and has followed the court's instructions on the law" does not appear well-founded.

The jury was instructed with CALJIC No. 2.20, which states that jurors are the "sole judges of the believability of a witness and the weight to be given the testimony of each witness." The instruction said one of the factors the jury may consider is a witness's prior felony conviction or past criminal conduct amounting to a misdemeanor. The instruction provides a non-exclusive list of other considerations for determining witness credibility, including "the attitude of the witness toward [the] action or toward the giving of testimony," "an admission by the witness of untruthfulness," and "whether the witness is testifying under a grant of immunity." (CALJIC No. 2.20.) The court also instructed the jury with CALJIC No. 2.23, which says "[t]he fact of a conviction does not necessarily destroy or impair a witness' believability. It is one of the circumstances that you may consider in weighing the testimony of that witness."

The record discloses any number of permissible grounds, in addition to prior convictions, on which Juror No. 5 could have questioned and, according to several jurors, did question the credibility of the prosecution's witnesses. Evidence elicited from both the prosecution and defense showed that many of the witnesses who implicated McGhee in the shootings were present or former gang members. Most of those witnesses testified at trial that they did not remember the events in question, and other witnesses admitted having lied to the police about what

they knew. Among those who did cooperate on the witness stand, former Toonerville member Mark Gonzales testified under a grant of immunity, and there was evidence suggesting other witnesses had received a benefit in exchange for testifying. Notably, Juror No. 10 commented that Juror No. 5's belief that the prosecution witnesses were lying and had something to gain was "true in a way." Moreover, as discussed below, the defense introduced evidence from which it could be inferred that several witnesses had been coached by detectives before implicating McGhee. (*Post*, at pp. 35–38.) The record does not manifestly support a finding that Juror No. 5 categorically would not believe persons with a prior conviction, as opposed to a finding that Juror No. 5 would not believe persons with a prior conviction *plus* other indicia of unreliability — a determination based on the multifactored consideration contemplated by the jury instructions.

The trial court also credited the jury foreperson's belief that Juror No. 5 "ha[d] an agenda, that he appeared to be prejudiced toward gangs. Said gang members wouldn't do certain things." According to the foreperson, Juror No. 5 said he would not believe the testimony of gang members who testified against another gang member because they "wouldn't do that." But the record shows that Juror No. 5's view in this regard is supported by evidence presented at trial. The prosecution's gang expert testified that snitching was not allowed within gang culture, even if someone was snitching on a rival gang. And both parties, through questioning and argument, made essentially the same point that a gang member ordinarily would not testify against another gang member. The prosecutor argued that a gang member who testified notwithstanding the risk of being retaliated against for being a snitch was telling the truth. For

example, he argued in rebuttal that "there are people who have come into court and put their lives on the line . . . so that we can know what happened." The defense urged that the gang members who testified against McGhee had obtained personal benefits for doing so, including the dismissal of pending or potential charges against them, and could not be trusted.

In concluding that Juror No. 5 was biased, the trial court also cited the testimony of jurors who said Juror No. 5 believed that all the prosecution witnesses had been coached. In its ruling, the court found Juror No. 5 evasive and untruthful when he replied "Well, not all" in response to the court's question about those accusations. The court's doubt about Juror No. 5's reply is supported by the testimony of Jurors Nos. 3, 8, 9, 11, and 12, who related that Juror No. 5 said during deliberations that all the prosecution witnesses had been coached. As noted, we generally defer to a trial court's credibility determinations to the extent they are based on firsthand observations unavailable to us on appeal. (*Barnwell*, *supra*, at p. 1053.) But a closer examination of the record and the jurors' remarks shows that the concerns expressed by Juror No. 5 were more specific, and the number of witnesses he did not believe was limited to eyewitnesses and witnesses who had testified that McGhee admitted his involvement in the shootings. To the extent the court thought Juror No. 5's belief that *all* prosecution witnesses had been coached showed a bias against law enforcement, the court did not examine relevant aspects of the trial record.

As previously mentioned, an impartial juror is one who bases his or her decisions on the facts adduced at trial. (*Nesler*, *supra*, 16 Cal.4th at p. 581.) Thus, we must inquire whether, "in light of the entire record" (*Barnwell*, *supra*, 41 Cal.4th at p. 1052), Juror No. 5's view that the prosecution eyewitnesses

and informant witnesses had been coached was based on the evidence at trial or manifestly supported the court's conclusion that he had a bias against the police or prosecution. In several respects, the record does not support the trial court's conclusion.

Juror No. 11, on whose testimony the trial court relied, twice said he believed Juror No. 5 was biased because he "doesn't like the cops *in this case*." The italicized phrase indicates that Juror No. 5 held a specific view of the police in this case, not a predisposition against law enforcement in every case. (Cf. *People v. Feagin* (1995) 34 Cal.App.4th 1427, 1436–1437 [trial court did not abuse its discretion in discharging a juror who had expressed the view, after referring to the Rodney King incident, that the police department is prejudiced against Black people]; *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1482, 1482 [upholding discharge of a juror who believed "police officers in Los Angeles generally lie"].)

Also telling is the jurors' note to the court that prompted the misconduct hearing. The note complained that Juror No. 5 "has been swayed and is not capable of making a fair decision." The assertion that Juror No. 5 "has been swayed" suggests he had been persuaded by the evidence to find the prosecution witnesses not credible. It does not suggest he had a preset bias against law enforcement unrelated to the evidence in this case. Nor does it suggest he was incapable of making a fair decision. Although "some jurors may be understandably impatient that another will not adopt their view and abandon his or her own" (*Allen and Johnson, supra*, 53 Cal.4th at p. 75), the fact that a juror may come to a different conclusion than other jurors in evaluating witness credibility does not provide grounds to remove him for bias. (See *Barnwell*, *supra*, 41 Cal.4th at p. 1051.)

McGhee's counsel framed his closing argument by declaring that the testimony of the prosecution's witnesses was "worthless." To support that argument, counsel reviewed the testimony of the witnesses who identified McGhee as the shooter in the various incidents — Cardiel, Sanchez, Perez, Rivas, Recio, Mark Gonzales, Duran, and Miranda — and compared it to the defense evidence showing those witnesses' inaccuracies, inconsistencies, and unbelievability. The defense devoted much of its guilt phase case to showing that many of the prosecution witnesses had been coached by detectives before making their statements implicating McGhee. For example, prosecution witnesses Cardiel, Sanchez, Rivas, and Natividad each testified that the detectives pointed out McGhee's picture in the photo lineups or mentioned McGhee's name during their interviews. No law enforcement witness denied the statements or techniques attributed to them by these witnesses. On this record, Juror No. 5 could infer a pattern in law enforcement's handling of the prosecution's principal witnesses, even if other jurors were not swayed by the evidence of coaching.

More broadly, there was evidence from which Juror No. 5 could have concluded that the prosecution witnesses were lying, even if other jurors did not share that view. The defense pointed to the testimony of Rivas, Recio, Perez, and Mark Gonzales to show that some of the prosecution witnesses had received a benefit for implicating McGhee. The defense also presented evidence that the prosecution witnesses lacked credibility because they were gang members and had lengthy criminal records. For example, Mark Gonzales admitted he was a former member of the Toonerville gang and had a significant criminal record and arrest history. Natividad testified he was formerly a

member of the Pinoy Real gang and had an extensive criminal record.

Other evidence showed that some of the witnesses were drug users and had been under the influence of drugs or alcohol either at the time of the shootings or when McGhee later told them about his involvement. Monica Miranda testified, for example, that she was a former methamphetamine user and had previously testified at a court hearing while under the influence. Gonzales told the jury that he and McGhee had ingested methamphetamine when McGhee told him years after the incident that he had shot Martin. The evidence also showed that none of the prosecution witnesses had willingly come forward to police with information close in time to the shootings. Miranda explained that she didn't "want problems." Perez testified that he did not come forward initially with what he knew about the police ambush because he feared retaliation.

In sum, the trial court concluded that Juror No. 5 had "a strong anti-prosecution bias" without carefully examining whether Juror No. 5's belief that the prosecution witnesses were lying was a plausible inference from the evidence presented. In fact, Juror No. 5's views largely aligned with the defense evidence in this case.

In concluding that Juror No. 5 was biased, the trial court credited "discussion from the jurors . . . about how he is speculating on the evidence and that the speculation is governing his view of the evidence." The court did not mention any of the examples offered by the complaining jurors, but those examples show that Juror No. 5's views were generally grounded in the evidence and reflected inferences that could reasonably be drawn from the evidence in light of one's life

experience. (See *Allen and Johnson, supra,* 53 Cal.4th at p. 76 [" 'Jurors' views of the evidence . . . are necessarily informed by their life experiences' "].)

Juror No. 9 told the court that Juror No. 5's disbelief of Monica Miranda's testimony implicating McGhee was "based upon speculation." According to Juror No. 9, Juror No. 5 "does not believe she saw anything because why would someone go outside when they hear shooting? We'll ask him, well, what does she have to gain from all of this? He'll say, 'Well, you know, she's a single mom. It doesn't even make any sense. She's a single mom.' " But the fact that Juror No. 9 disagreed with Juror No. 5's skepticism, which aligned with a defense witness's testimony that Miranda was in the house at the time the shooting occurred, does not mean Juror No. 5 engaged in speculation. No specialized knowledge or leap of logic is needed for Juror No. 5 to question whether a mother who was on her own that evening with four young children would place herself in danger by venturing outside amidst an active gang-related shooting.

Juror No. 11 also said Juror No. 5 was "totally speculating" in disbelieving Miranda, explaining that "[f]or Monica Miranda he won't believe her. When she was on the stand she was kind of shaking and crying and getting nervous. He thinks, that is her lying." But the fact that Juror No. 11 and Juror No. 5 drew different inferences from Miranda's demeanor on the witness stand does not mean Juror No. 5 was speculating. Rather, her demeanor and body language were relevant factors bearing on each juror's assessment of her credibility. Indeed, the court had instructed the jury that the factors it may consider when determining witness credibility include "the demeanor

and manner of the witness while testifying." (CALJIC. No. 2.20; see Evid. Code, § 780.)

The Attorney General points to Juror No. 11's testimony that Juror No. 5 was "pulling things out of the air" when he said he "doesn't believe Monica Miranda because she was drinking and doing drugs that night." Miranda testified that she was a former methamphetamine user and had been arrested for possession of drug paraphernalia sometime after the preliminary hearing in the case. She also admitted coming to a court hearing while under the influence of methamphetamine. But during cross-examination, she denied being under the influence on the night of the Mendoza shooting. Because the issue of Miranda's drug use was before the jury, it cannot be said that Juror No. 5's view, though inconsistent with Miranda's denial, had been pulled "out of the air." Given the evidence of Miranda's drug use at other times and occasions, Juror No. 5 may have disbelieved Miranda's denial, or he may have overlooked it. Neither amounts to speculation.

In their note, Jurors No. 9 and No. 11 also complained that Juror No. 5 was speculating when he said he did not believe the eyewitness testimony of John Perez, who said he saw McGhee shooting at the patrol car during the police ambush. Juror No. 9 reported that Juror No. 5 said " 'if I heard shots, I would fall onto the floor and try to protect myself' "; according to Juror No. 9, "[t]hat's speculation." But Juror No. 5 simply evaluated Perez's account of events by relying on common sense and his own life experience. This is not only permissible but expected when jurors evaluate evidence. (See *Allen and Johnson, supra*, 53 Cal.4th at p. 76.) Juror No. 11 similarly complained that Juror No. 5's skepticism regarding Perez's ability to observe the police ambush from his bathroom window was based on

speculation. But a defense witness testified that a six-foot fence and the bushes growing on top of it would have blocked the view of the street from the apartment where Perez said he saw the shooting. In light of this evidence, we cannot say that the trial court's finding that Juror No. 5 engaged in speculation is manifestly supported by the record.

Finally, the trial court credited "several complaints from jurors about the fact that Number Five doesn't provide reasons. He doesn't make sense. He's not rational. Number 7 said there's no reason why he thinks what he does." Although it is true that several jurors made this complaint about Juror No. 5, this characterization of Juror No. 5's conduct is belied by the testimony of Jurors No. 9 and No. 11 quoted above. While complaining that Juror No. 5 did not give reasons for his views, Jurors No. 9 and No. 11 themselves reported the reasons why Juror No. 5 did not find Monica Miranda or John Perez to be credible witnesses. (*Ante*, at pp. 39–40.) The complaining jurors may have found those reasons unpersuasive, but their testimony undercuts the notion that Juror No. 5 had no reasons, other than anti-prosecution bias, for disbelieving those witnesses.

Several jurors complained that Juror No. 5 did not explain why he thought the prosecution witnesses had been coached or were lying. These complaints likewise do not manifestly support the trial court's finding of "a strong anti-prosecution bias." The evidence at trial supported the reasons that the complaining jurors attributed to Juror No. 5 for disbelieving the prosecution witnesses: They had prior convictions; they had not come forward immediately; several were current or former gang members; several had been coached; and several received leniency in exchange for their testimony. Juror No. 5's disbelief

was not based on ideas unconnected to the evidence; no one alleged, for example, that Juror No. 5 thought any witness's testimony had been coerced. Nor was his disbelief based on broad generalizations about the police or prosecution. Recall that Juror No. 11, who cowrote the note that prompted the court's inquiry, twice said that Juror No. 5 "doesn't like [or believe] the cops *in this case*." (Italics added.) This is not a case like *Barnwell*, where we upheld the removal of a juror for bias after fellow jurors reported that the juror said " '*all* law enforcement will *always* back each other up regardless of [whether] it is right or wrong" and, simply, " '[l]aw enforcement lies.' " (*Barnwell*, *supra*, 41 Cal.4th at p. 1049.)

It is understandable that fellow jurors may become frustrated when a juror does not satisfactorily explain his point of view. And "[i]t may be argued that Juror No. [5]'s conclusion was based upon a weak premise or rested upon an overbroad inference. Jurors, however, are the judges of credibility, and conscientious jurors may come to different conclusions. It is not the province of trial or reviewing courts to substitute their logic for that of jurors to whom credibility decisions are entrusted." (*Allen and Johnson*, *supra*, 53 Cal.4th at p. 78.)

The Attorney General argues that Juror No. 5 judged the prosecution witnesses' testimony by a different standard than he used to assess the testimony of the defense witnesses. As the Attorney General notes, Juror No. 11 testified that although Juror No. 5 said he "wasn't prone to accept anybody's testimony from the prosecution because everybody has convictions," Juror No. 5 was willing to believe the testimony of defense witness Desiree Mendoza, who had a warrant for check fraud. According to Juror No. 11, Juror No. 5 denied having said he would not accept the testimony of witnesses who had prior convictions, but

the other jurors responded, "Yes, you did." Juror No. 11 also complained that although Juror No. 5 said he did not trust the prosecution witnesses who failed to report what they knew to the police immediately after the crimes, he believed defense witnesses who had come forward later, even just before trial, and did not explain why.

The court's ruling did not specifically credit these comments by Juror No. 11 or otherwise identify particular inconsistencies in how Juror No. 5 evaluated the testimony of prosecution and defense witnesses. (See *Barnwell, supra*, 41 Cal.4th at pp. 1052–1053 [the demonstrable reality test "requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established"].) Based on the evidence at trial, Juror No. 5 could have discounted the credibility of prosecution witnesses for reasons such as coaching and immunity benefits that had no applicability to defense witnesses. Our review focuses on the evidence on which the trial court "actually relied" in its ruling (*id.* at p. 1053), and the trial court here made no finding that Juror No. 5 applied a different standard in evaluating the testimony of defense witnesses.

The trial court explained in its ruling that the parties deserved to have jurors who would not engage in a "blanket disregard of one side's evidence." But the record does not show that is what happened here. The complaints against Juror No. 5 show that he was rejecting, not disregarding, the prosecution's evidence, and the record as a whole indicates that his rejection was based on the evidence adduced at trial. In light of the totality of the evidence as well as the "more comprehensive and less deferential" standard of review that applies to a claim of error based on the dismissal of a juror for failing to perform his

or her duty (*Barnwell*, *supra*, 41 Cal.4th at p. 1052), we cannot say that the record shows to a demonstrable reality that Juror No. 5 exhibited an improper bias against law enforcement or the prosecution warranting his removal. We hold that the trial court erred in removing Juror No. 5 from the jury during guilt phase deliberations and that the error requires reversal of the judgment. (See *Armstrong*, *supra*, 1 Cal.5th at p. 454; *Allen and Johnson*, *supra*, 53 Cal.4th at p. 79.)

## CONCLUSION

We reverse the judgment in its entirety and remand the case to the trial court for further proceedings. In so doing, we have not considered McGhee's other claims of error, including his claim under the California Racial Justice Act of 2020 (§ 745), and he remains free to raise that claim if the prosecution elects to retry McGhee and seeks a judgment of death.


**LIU, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. McGhee

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S169750
**Date Filed:** April 3, 2025

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Robert J. Perry

_____

**Counsel:**

Patrick Morgan Ford, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, James William Bilderback II, Assistant Attorney General, Jamie L. Fuster, Seth P. McCutcheon, Stacy S. Schwartz and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Patrick Morgan Ford
Attorney at Law
1901 First Avenue, Suite 400
San Diego, CA 92101
(619) 236-0679

Seth P. McCutcheon
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6133